BRYAN, Judge.
K.F. (“the mother”) appeals from a dis-positional judgment in three separate dependency actions that transferred custody of her three children, N.T., A.F., and M.T. (referred to collectively hereinafter as “the children”) from the Cleburne County Department of Human Resources (“DHR”) to V.F. and C.L.

Procedural History

On September 29, 2009, DHR filed a petition in case no. JU-08-107.03, seeking to transfer custody of A.F., a child born to *985 the mother and V.F., the father, in January 2001, from DHR to C.L., who is V.F.’s daughter and the half sister of A.F. The petition alleged that DHR had had custody of A.F. since February 2009, that A.F. had been living with C.L. since August 2009, that C.L. was able and willing to care for A.F., and that DHR thought that placement of A.F. with C.L. was in A.F.’s best interest. On the same day, in case no. JU-08-108.03, DHR filed a petition to transfer custody of M.T., a child of the mother and V.F. born in April 2002, from DHR to C.L. The petition alleged that DHR had had custody of M.T. since February 2009, that M.T. had been living with C.L. since August 2009, that C.L. was able and willing to care for M.T., and that DHR thought that placement of M.T. with C.L. was in M.T.’s best interest.
On January 29, 2010, in case no. JU-08-109.03, V.F. filed a petition seeking custody of N.T., a child of the mother that was born in August 1994. In his petition, V.F. alleged that N.T. was his stepson, that N.T. had been in the custody of DHR since February 2009, and that DHR had placed N.T. in his custody in August 2009. V.F. subsequently filed a motion to intervene in the dependency action filed by DHR regarding N.T.
The trial court conducted an ore tenus hearing on the pending custody petitions on October 28, 2010. On December 9, 2010, the juvenile court entered a judgment on DHR’s and V.F.’s petitions to transfer custody.[1] The juvenile court awarded custody of N.T. to V.F., and it awarded custody of A.F. and M.T. to C.L. The mother was awarded standard visitation with the children, as set forth in an exhibit attached to the judgment. However, the judgment further stated that the mother’s visitation with the children “shall not be overnight until the mother provides documentation to the current custodians of her completion of an intensive outpatient or inpatient treatment program which addresses her alcohol use.”
The mother subsequently filed a petition to alter, amend, or vacate the judgment pursuant to Rule 59, Ala. R. Civ. P. The mother’s postjudgment motion was denied by operation of law, see Rule 1(B), Ala. R. Juv. P., and the mother filed a timely notice of appeal in each action. This court has consolidated the mother’s appeals.

Issues

On appeal, the mother argues that the juvenile court erred by transferring custody of N.T. to V.F. and by transferring custody of A.F. and M.T. to C.L. She also argues that the juvenile court’s award of visitation is erroneous because it is vague and ambiguous.

Facts

The record indicated that the juvenile court had adjudicated the children to be dependent soon after they were removed from the mother’s custody, for the second time, in February 2009. At the time of trial, N.T. was 16 years old, A.F. was almost 10 years old, and M.T. was 8 years old. The record indicated that the mother and V.F., who is the father of A.F. and M.T., were married before A.F. was born and that they separated in 2005. At the time of trial, the mother and V.F. were still legally married.
Carrie Pollard, a caseworker with DHR, testified that the children were first re *986 moved from the mother’s home in October 2008 and that, after some time, they were returned to the mother’s custody. However, the children were removed from the mother’s home again in February 2009 after DHR received a report regarding domestic violence and alcohol use in the home; apparently, the safety plan that had been put in place by DHR had not been followed. At that time, the mother’s primary barrier to reunification with the children was her abuse of and her addiction to alcohol.
Pollard stated that DHR had recommended that the mother participate in services to address her alcohol abuse, including an outpatient substance-abuse program, ongoing counseling, and attendance in an Alcoholics Anonymous or Narcotics Anonymous support group. According to Pollard, the mother had participated in two different outpatient alcohol-treatment programs: Pathways in Georgia and New Directions in Anniston. Pollard stated that she had asked the mother to produce documentation to prove that she had completed an alcohol-treatment program at an Individualized Service Plan (“ISP”) meeting in July 2010, but, as of October 2010, the mother had not done so. Pollard was aware that the mother had participated in a program called Celebrate Recovery, but, as far as she knew, the mother had not attended that program since July 2009.
Carrie Halladay, a licensed professional counselor, stated that she had counseled the mother from February 2009 through October 2009. According to Halladay, after some time, the mother eventually admitted that she had an addiction to alcohol and that she had relapsed once she became involved with R.T.E., a paramour with whom the mother was still involved at the time of trial. During one counseling session, R.T.E. admitted that he had driven with the children after drinking alcohol and that he had been pulled over and charged with three counts of reckless endangerment. Halladay stated that the mother did not have a driver’s license because she had gotten into an alcohol-related automobile accident after DHR took custody of the children. Halladay stated that, in order for the children to be returned to the mother, the mother needed to successfully complete outpatient alcohol treatment and counseling at New Directions.
Halladay stated that her counseling sessions with the mother had taken place in the mother’s home in Ranburne and that they had abruptly ended in October 2009 when the mother and R.T.E. moved. Hal-laday stated that the mother did not achieve the goals that Halladay had set for her before she stopped attending counseling. Halladay, who the parties stipulated was an expert in the area of alcohol counseling, stated that statistics showed that 95% of alcoholics will relapse without completion of some type of treatment program. However, she also stated that someone who was involved in church and who participated in Alcoholics Anonymous or a similar program had a reduced chance of relapsing.
The mother testified that she had not consumed alcohol since the day the children were taken from her in February 2009. She stated that she did not complete treatment at New Directions or Pathways because she could not afford to pay for the programs and DHR had not provided any financial assistance. The mother testified that she had been employed for only two or three months while she lived in Georgia. The mother stated that she had participated in a program called Celebrate Recovery, a Christian-based recovery program for any kind of addiction, approximately three times a week for one year. She stopped partici *987 pating in the Celebrate Recovery program at the time she started New Directions because the programs met on the same days. She also stated that she did not have a driver’s license because she was legally blind.
DHR had also required the mother to maintain stable housing and employment and to keep DHR notified of her whereabouts. Pollard stated that she had an address for the mother in Georgia but that she did not have the mother’s current address. Pollard also stated that she was not aware of any goal that the mother had reached that had been set by DHR.[2] Pollard stated that the mother stopped all services through DHR, except visitation with the children, in October 2009, approximately one year before trial. From April 2009 through the time of trial, the mother visited the children every Sunday from 8:00 a.m. to 5:00 p.m. Pollard stated that DHR had not allowed the mother to exercise overnight visitation with the children because she had not completed a substance-abuse-treatment program.
R.T.E. stated that he and the mother had begun a relationship in 2005 and that they had moved in together in mid 2006. R.T.E. testified that he had participated in substance-abuse counseling through Pathways and New Directions after DHR removed the children from his and the mother’s home. R.T.E. admitted that he had not completed a substance-abuse-rehabilitation program as requested by DHR, but he contended that it was because of financial constraints. However, he stated that he had participated in Celebrate Recovery, which he began in August 2008. When asked if he had completed the Celebrate Recovery program, he stated that he went as far as he could go in the book. He supported the mother in her request to have custody of the children returned to her.
In September 2010, the mother and R.T.E. were hired by their pastor to be caretakers of a church camp in Cleburne County. The mother and R.T.E. lived in the caretakers’ home, which had three bedrooms, on the property of the church camp. The mother’s pastor testified that the mother had been consistently visiting his church for 14 months and that he had never seen any indication that the mother was abusing or using alcohol.
According to Pollard, she contacted V.F. after the children were placed in foster care in February 2009, and, she stated, at that time, V.F. was living with C.L. in Georgia, along with C.L.’s husband and son. V.F. and C.L. had weekly visitation with the children while they were in foster care. Pollard stated that the children were placed in V.F. and C.L.’s care in August 2009 after a successful home study was completed pursuant to the Interstate Compact on the Placement of Children (“ICPC”). Pollard stated that the Georgia counterpart of the Department of Human Resources had maintained contact with V.F. and that she had spoken to V.F.’s Georgia caseworker. Pollard stated that V.F. had no issues with drugs, alcohol, or domestic violence and that she had no concerns about the children residing in V.F. and C.L.’s home.
The mother had objected to the placement of the children with V.F. and C.L. at that time because V.F. had not seen the children in two years and because, she *988 alleged, there had been domestic violence issues between her and V.F. when they had lived together. The mother stated that, when she and V.F. separated, V.F. had left her with no way to support herself or the children and that he had not been involved with the children after 2004. However, V.F. testified that he had been unable to locate the mother and the children after the mother moved out of their home in 2005. V.F. stated that he had been prevented from providing support for the children because he did not know where they were. V.F. further testified that he did not have an alcohol problem, that he had never hit the mother, and that he had never hit the children.
Pollard stated that the children appeared to be happy in V.F. and C.L.’s home. However, she admitted that N.T. and M.T. had received poor grades after they were initially placed in V.F. and C.L.’s home and that N.T. had not passed his grade while he lived with V.F. and C.L. in Georgia. However, Pollard also stated that N.T. and M.T. had had poor grades while they were in the mother’s custody as well. V.F. testified that, at the time of trial, A.F. was making As and Bs in school; that N.T. was making primarily As and Bs but had received a grade of 60 in one class; and that M.T. was making primarily As and Bs but had one C. V.F. testified that the children did not have any behavioral issues at school and that he had been to school to meet their teachers on two or three occasions.
At the time of trial, V.F. and C.L. had relocated from Georgia to Cleburne County and Pollard had visited their home, which had 4 bedrooms and sat on 15 acres of land. DHR had performed a home study on their residence, which had been approved. Pollard stated that DHR recommended that custody of A.F. and M.T. be placed with their half sister, C.L. According to Pollard, DHR was not providing any services to C.L., C.L. had been caring for A.F. and M.T. for approximately 14 months, and C.L. was able to meet the needs of A.F. and M.T. Pollard stated that DHR recommended that the juvenile court place custody of N.T. with V.F., who had been caring for N.T. for approximately 14 months.
The mother stated that she did not want her children in the custody of V.F. or C.L. because the children had been coming to visitation dirty and unkept and because, the mother alleged, C.L. had tried to breast-feed A.F. when he was an infant despite the fact that C.L. was not breastfeeding a child of her own at that time. The mother later admitted that she had merely seen C.L. attempt to lift up her blouse and that she was not sure what C.L.’s intentions had been. The mother also complained that A.F.’s skin condition, which was a result of being severely burned as a child, had worsened after being in C.L.’s custody. Pollard stated that she had seen the burns on A.F.’s arms approximately two weeks before trial and she had not noticed that they looked any worse than usual. V.F. testified that A.F. had had sores on his burned skin when he first came to live with him and C.L., but he denied that there were any sores on A.F.’s burned skin at the time of trial. The mother stated that, if the juvenile court did not place custody of the children with her, she would rather the children be placed in foster care then be placed in the custody of V.F. and C.L.
At the conclusion of trial, the guardian ad litem of the children recommended that custody of N.T. be placed with V.F. and that custody of A.F. and M.T. be placed with C.L.

Discussion

Initially, the mother challenges the custodial disposition of the children. It is *989 well settled that, after a child has been adjudicated to be dependent, a juvenile court may make any custodial disposition that serves the best interests of the child.
See § 12-15-314(a), Ala.Code 1975; and W.T.H. v. 915 So.2d 64, 70 (Ala. Civ.App.2005) (explaining that, under former § 12-15-71, Ala.Code 1975, the predecessor statute to § 12-15-314(a), the “best interests” standard applies during the dis-positional phase of a dependency proceeding).
“In Ex parte Alabama Department of Human Resources, 682 So.2d 459 (Ala. 1996), the Alabama Supreme Court stated the applicable principles of appellate review in the context of a challenge to a juvenile court’s custodial disposition of a dependent child:
“ ‘Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court’s findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error. Renter v. Neese, 586 So.2d 232 (Ala.Civ.App.1991); J.S. v. D.S., 586 So.2d 944 (Ala.Civ.App.1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala. 1992). An appellate court will not reverse the trial court’s judgment based on the trial court’s findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See Ex parte Walters, 580 So.2d 1352 (Ala.1991).’
“682 So.2d at 460.”
J.J. v. J.H.W., 27 So.3d 519, 522 (Ala.Civ.App.2008).
The mother contends, citing § 12-15-314(a)(3)c., Ala.Code 1975, that the juvenile court erred in awarding custody of N.T. to V.F. because V.F. is not a relative of N.T. Section 12-15-314(a)(3)c. provides that a juvenile court may, after adjudicating a child to be dependent,
“[tjransfer legal custody to-[a] relative or other individual who, after study by the Department of Human Resources, is found by the juvenile court to be qualified to receive and care for the child. Unless the juvenile court finds it not in the best interests of the child, a willing, fit, and able relative shall have priority for placement or custody over a non-relative.”
The mother argues that the juvenile court should have awarded her custody of N.T. because V.F. is not related to N.T., because V.F. abandoned her and the children after they separated, and because V.F. did not provide any support for the children after she and V.F. separated. Although V.F. and N.T. have no biological connection, the only party that sought custody of N.T. that was a relative of N.T. was the mother. However, the juvenile court had previously adjudicated the children to be dependent while in the mother’s custody, and the evidence at trial indicated that the mother had not met the ISP goals set by DHR that were required in order for the mother to regain custody of the children. Accordingly, the juvenile court could have determined that the mother was not a “fit and able relative” that should have had priority for placement of N.T. over V.F. Moreover, the juvenile court could have concluded that V.F. had not abandoned the children after he and the mother separated but instead that V.F. had been unable to locate the mother and the children after the separation in order to provide support for the children.
The mother also argues that N.T.’s best interests were not being served in the custody of V.F. because the record indicated that N.T.’s grades were poor in V.F.’s *990 custody. The evidence indicated that N.T.’s grades were initially poor after custody was transferred to V.F., but the evidence also indicated that N.T. had poor grades while he was in the mother’s custody. Furthermore, V.F. testified that N.T.’s grades had improved as of the time of trial and that he had only one below-average grade. Finally, V.F. testified that N.T. had no behavioral problems in school, Pollard testified that N.T. was happy in V.F.’s custody, and the record indicated that, after an investigation was conducted, neither DHR nor their counterpart in Georgia had any issue with V.F.’s being a custodian for N.T. See § 12 — 15— 314(a)(3)c. Accordingly, we cannot conclude that the juvenile court’s determination that the best interests of N.T. would be served by placing his custody with V.F. was plainly or palpably wrong.
The mother also argues that the juvenile court erred in awarding custody of A.F. and M.T. to C.L. because the evidence indicated that A.F.’s burned skin had gotten worse since C.L. had had custody of A.F. and because she had allegedly seen C.L. attempt to breast-feed A.F. The juvenile court was presented conflicting and disputed evidence regarding whether the condition of A.F.’s burned skin had deteriorated since A.F. was placed in the custody of C.L. The record indicates that the juvenile-court judge asked A.F. to come into the courtroom at the conclusion of the trial so that his skin could be examined. The results of that examination are not in the record on appeal. Considering that the evidence was disputed and that the juvenile-court judge had the opportunity to view at least parts of A.F.’s burned skin, we must conclude that the juvenile court determined that A.F.’s skin condition had not deteriorated while in C.L.’s custody. Furthermore, the trial court could have concluded that the mother’s allegation that C.L. had once attempted to breast-feed A.F. was not credible because the mother admitted that she was not sure of C.L.’s intentions at the time the mother thought that C.L. was attempting to breast-feed A.F. See Dunn v. Dunn, 972 So.2d 810, 815 (Ala.Civ.App.2007) (noting that the trial court is the best position to evaluate the demeanor and credibility of the parties because of its ability to observe the parties as they testify).
The mother further argues that the award of custody of A.F. and M.T. to C.L. was reversible error because C.L. did not testify during trial about her ability or willingness to care for A.F. and M.T. However, DHR filed the petition to transfer custody of A.F. and M.T. from DHR to C.L.; thus, it was DHR’s burden to prove that the best interests of A.F. and M.T. would be served by allowing custody of A.F. and M.T. to be transferred to C.L. Moreover, the record reveals that the mother did not argue before the juvenile court that its custodial disposition of A.F. and M.T. was error because C.L. did not testify at trial. Accordingly, because this argument is being raised for the first time on appeal, we cannot consider it. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (an appellate court cannot consider an argument raised for the first time on appeal as grounds to reverse the trial court’s judgment).
DHR presented evidence indicating that A.F. and M.T. were successfully placed in C.L.’s home in August 2009 after DHR’s counterpart in Georgia completed a successful home study and after C.L. visited the children when they were in foster care after they were first removed from the mother’s custody. As was the case with N.T., there was an indication that M.T.’s grades were poor when he was first placed with C.L., but other evidence indicated that, at the time of trial, M.T. had *991 brought his grades up and that A.F. was also doing well in school. Pollard testified that C.L. was able and willing to continue to care for A.F. and M.T. Pollard had visited C.L.’s new home in Cleburne County, and, after an investigation and home study was completed, DHR had approved C.L. and her home for custody of A.F. and M.T. From this evidence, the juvenile court could have concluded that the best interests of A.F. and M.T. would be served by transferring their custody from DHR to C.L., with whom they had been living for approximately 14 months before trial. See § 12-15-314(a)(3)c. Accordingly, the judgment transferring custody of A.F. and M.T. to C.L. is affirmed.
Next, the mother argues that the award of visitation, insofar as it limits her overnight visitation with the children, is vague and ambiguous. The mother was awarded standard visitation with the children as set forth in an exhibit attached to the juvenile court’s judgment. The mother’s visitation award included, for example, visitation with the children every first, third, and, when applicable, fifth weekend of each month from Friday at 6:00 p.m. until Sunday at 6:00 p.m. However, as set forth above, the mother was precluded from exercising overnight visitation with the children until she could provide documentation that she had completed an intensive outpatient or inpatient treatment program to address her alcohol use. The mother contends that, because the standard visitation schedule does not specifically set forth a time for visitation before she completes an alcohol-treatment program, the visitation award is vague and operates to deny her any visitation with the children.
The mother contends that the visitation award is similar to awards of visitation that leave the noncustodial parent’s visitation with the children left entirely to the discretion of the custodian of the children. See, e.g., Bryant v. Bryant, 739 So.2d 53, 56-57 (Ala.Civ.App.1999) (reversing an award of visitation that left the father’s right to visit his children completely within the mother’s discretion); K.L.U. v. M.C., 809 So.2d 837, 841 (Ala.Civ.App.2001) (same); and R.K.J. v. J.D.J., 887 So.2d 915, 919 (Ala.Civ.App.2004) (award of visitation to mother “at reasonable times and places” was reversed because it failed to set forth a specific visitation schedule for the mother, because it “place[d] too much control over the noncustodial parent’s relationship with the children in the hands of the custodial parent,” and because the “visitation judgment [wa]s likely to increase the chance of further litigation over visitation matters”).
Although we find the present case distinguishable from cases that leave the noncustodial parent’s visitation award entirely to the discretion of the custodian of the children, we agree with the mother that the award of visitation, insofar as it fails to specifically set forth times she may visit the children until she is able to exercise overnight visitation, is unduly vague and could lead to additional litigation over visitation matters if the mother and V.F. or C.L. disagree on the extent of the mother’s visitation rights before she completes alcohol treatment. See Pratt v. Pratt, 56 So.3d 638, 644 (Ala.Civ.App.2010) (“The propriety of the [visitation] judgment depends on whether the noncustodial parent has a sufficient, specified visitation schedule to rely upon, independent of the custodial parent’s discretion.”). Accordingly, the judgment of the juvenile court is reversed insofar as it fails to specifically set forth the mother’s visitation rights until she is able to exercise standard visitation as set forth in the juvenile court’s judgment, and we remand the case -with instructions to enter a judgment consistent with this opinion.

*992
Conclusion

The juvenile court’s custodial disposition of the children is affirmed. However, the visitation provisions of the judgment are reversed, and the case is remanded with instructions to the juvenile court to enter a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN and THOMAS, JJ., concur.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.

. The judgment indicates that the juvenile court was also ruling on the mother’s petition for custody of A.F., M.T., and N.T. The record on appeal does not contain a petition filed by the mother requesting custody of the chil-tiren, but it is clear from the record on appeal that the mother was seeking custody of the children during the October 2010 ore tenus hearing.

. There is an indication in the record that the juvenile court had entered an order, on or about August 25, 2010, that ordered the mother to submit to inpatient substance-abuse treatment or to fully participate in a therapeutic outpatient program as directed by DHR. Pollard stated that, to her knowledge, the mother had not complied with that order as of October 2010.