MOORE, J.
|]The defendant, Corey Lynn Gay, was convicted by a jury of distribution of methamphetamine, in violation of La. R.S. 40:967(A)(1). Subsequently, he was adjudicated a seventh-felony habitual offender and sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant now appeals his conviction and sentence. For the following reasons, we affirm the defendant’s conviction and sentence.
FACTS
Gay was charged by an amended bill of information with distribution of a Schedule II Controlled Dangerous Substance (“CDS”) in violation of La. R.S. 40:967(A)(1). The bill alleges the unlawful act occurred on June 24, 2011. The defen *923 dant waived arraignment and pled not guilty on September 12, 2011.
A jury trial began on July 10, 2012. In the course of the trial, the state produced evidence that on June 24, 2011, a task force of Shreveport Police Department (“SPD”) law officers commenced an undercover operation coordinated by Agent Keith Knox with the defendant as its target. Undercover SPD Officer Allen Alkire contacted the defendant and arranged a meeting with him for the purpose of buying methamphetamine. The defendant instructed Alkire to meet him at the Brook-shire’s grocery store parking lot on North Market Street in Shreveport. Agent Al-kire drove to the Brookshire’s to meet the defendant, while other officers (hereinafter called the “cover team”) watched from nearby. Alkire was carrying audio and visual surveillance equipment during his encounters with the defendant. Officer Knox listened to the interactions through a transmission from this ^equipment. Officer Alkire waited at the Brookshire’s parking lot 30 to 40 minutes before the defendant arrived in a compact sedan. He pulled up alongside Alkire’s vehicle, window to window. The defendant instructed Alkire to follow him to the Highland neighborhood where he would acquire the methamphetamine.
Agent Alkire followed the defendant to a Circle K store at the corner of Olive Street and Centenary Boulevard. The cover team followed secretly. Upon arrival, the defendant told Alkire to remain at the store while h went around the corner to get the methamphetamine. Alkire saw the defendant walking westbound on Olive Street and then lost sight of him.
A few minutes later, the defendant telephoned Alkire and told him to come pick him up on Highland Road where he would be walking. Alkire drove down Olive Street, turned left (southbound) on Highland, and saw the defendant walking northbound on the sidewalk. He drove past him and turned his vehicle around at the next intersection, driving back alongside the defendant and stopped. Gay got into the passenger side of the vehicle. Once in the vehicle, Gay gave the methamphetamine to Alkire. In exchange, Alkire gave Gay five twenty-dollar bills whose serial numbers had been recorded.
Alkire drove the vehicle to a tire shop near the intersection of Olive and Centenary where he let the defendant out of the vehicle. ' At this time Agent Knox was able to see the defendant clearly for the first time. After Gay left the vehicle, Alkire stated into the recording equipment, “That was Corey Gay.” During trial, Gay contested the admissibility of Alkire’s recorded statement identifying him, arguing that: (1) it was hearsay, (2) that [ait implied that he was targeted because the state suspected him of other bad acts, and (3) that it was more prejudicial than probative. The court decided that the statement would not be hearsay if introduced through Agent Alkire’s testimony, and that the jury would not infer from the statement that the state had investigated the defendant for other bad acts. The court allowed the statement to be presented to the jury.
After the defendant departed from Agent Alkire’s vehicle, the officers met at a predetermined place. Alkire gave Officer Knox the substance that he had bought from the defendant. The officers performed a field test upon the substance, and the test yielded a positive result for the presence of methamphetamine. Officer Knox labeled the bag and put it into a locked drop box at the police station. A property room attendant normally takes things from the drop box and brings them to the property room. At trial, Agent Alkire identified the plastic bag and crystalline substance introduced as the drugs *924 he bought from the defendant and gave to Officer Knox. Knox identified the writing on the plastic bag as his own. The officers did not recover the marked money used by Agent Alkire to purchase the drugs, but Knox testified that he did not expect to get it back. The state played the audio-visual recording of the entire encounter at trial, and submitted the recording into evidence.
About two weeks after the undercover operation described above, Officer Knox created a six-person photographic lineup which he presented to Agent Alkire on July 8, 2011. Alkire identified the photograph of the defendant as the person from whom he met and purchased the drugs. The state later introduced the lineup document, with Alkire’s mark on the picture 14of the defendant, at trial. Officer Knox prepared an arrest warrant for the defendant on July 13, 2011. Both Knox and Alkire noted that the defendant’s physical appearance in court was different from his appearance on the day of the offense. He wore a “doo rag” and a hat during the crime, but no glasses. In court, he wore glasses but no hat or “doo rag.” Nonetheless, both officers identified the defendant as the person who committed the crime.
Bruce Stentz, a forensic chemist at the North Louisiana Crime Lab in Shreveport, tested the purchased chemical to determine its composition. Stentz first weighed the chemical, which he did while it was still in its small plastic bag. The weight of the substance and its container together was 1.62 grams. Stentz estimated in court that the bag probably weighed about a gram, so that the chemical within it probably only weighed about 0.6 grams. He agreed with defense counsel that this is about half of the weight of a small one-gram package of sugar. After measuring the weight, Stentz performed two color tests upon the chemical. One color test was a Cobalt thiocyanate test, or Scott’s Test, which detects cocaine. The other test was the Marquis Test, which detects methamphetamine and amphetamine. The first test yielded a negative result for cocaine, but the second gave a positive result for methamphetamine or amphetamine. Stentz stated at trial that the Scott’s Test and the Marquis Test were merely presumptive. Stentz next tested the substance with a gas chromatograph mass spectrometer. The spectrometer determined that the chemical was methamphetamine.
On July 11, 2012, the jury found the defendant guilty as charged of distribution of methamphetamine, a Schedule II CDS, in violation of La. R.S. |r,40:967(A)(l). The judge ordered that a presentence investigation report be submitted, but only for the purpose of ascertaining the past convictions of the defendant.
On August 8, 2012, the state filed an habitual offender bill of information which asserted that the defendant had seven pri- or felony convictions which could serve as a basis for the present adjudication, and that the defendant therefore deserved fourth-felony habitual offender status under La. R.S. 15:529.1. The state asserted prior convictions for (1) felony theft in 1993, (2) unauthorized use of a movable in 1993, (3) simple arson in 1995, (4) accessory after the fact/attempted simple robbery in 1998, (5) attempted carjacking in 2000, (6) possession with the intent to distribute a Schedule I CDS in 2006, and (7) possession of a Schedule II CDS in 2012.
Habitual offender hearings were held on April 22 and 29, 2013. The defense and the prosecution agreed in the first hearing that they would not apply the habitual offender adjudication to the seventh conviction (the 2012 conviction for possession of a Schedule II CDS) because that conviction occurred after the instant conviction.
The defendant also made two additional objections. First, the defendant argued *925 that the fifth conviction (for attempted carjacking in 2000) should not be used for habitual offender purposes because of an irregularity arising from an alleged conflict of interest: the prosecutor for that conviction had served as the defendant’s lawyer for the third conviction — the 1995 conviction for simple arson. Second, the defendant argued that the transcript of the Boy-kin hearing for the sixth conviction (the 2006 conviction for possession of a Schedule I CDS) contained an insufficient Boy-kin | (¡admonition. According to defense counsel, in the 2006 hearing, the judge told the defendant: “[B]y pleading guilty to this charge you waive certain basic constitutional rights[.] They are the right to have a trial by a jury, the right to confront witnesses at that trial, the right not to be forced or compelled to testify or give evidence against yourself.” (Emphasis added.) The defendant contended that the Boykin colloquy was deficient because the court failed to inform him that he could confront the witnesses accusing or testifying against him, citing this court’s decision in State v. Russell, 46,426 (La.App. 2 Cir. 8/17/11), 78 So.3d 991. He argued that Russell requires that the judge tell defendants of their right to confront, not just any witnesses, but specifically those witnesses who were accusers.
The trial judge rejected these objections, finding that no conflict of interest existed in the fifth conviction, and that the Boykin colloquy satisfied Russell, supra, in the sixth conviction. The judge found the defendant to now be a seventh-felony habitual offender, and, in a May 6, 2013, hearing, sentenced him to the statutorily-required term of life in prison.
Defendant filed this appeal.
DISCUSSION
By his first assignment of error, the defendant alleges that the jury erred as a matter of law in convicting him of Distribution of CDS, Schedule II, Methamphetamine, because the evidence was insufficient to convict. The defendant makes two specific arguments for insufficiency. First, he argues that the state failed to prove the identity of the person who committed the lycrime. The undercover agent never saw the perpetrator until the day of the encounter with him, that the agent never recorded the perpetrator’s license plate number though he had the opportunity to do so, that the agent did not pick the defendant from a lineup until two weeks after the encounter, that the defendant looked different in court from how the offender looked on the day of the crime, and that the agent stated in the recording of the encounter that the perpetrator was tall with a big chest, whereas the defendant’s rap sheet stated that he was five feet and seven inches tall and that his weight was 167 pounds.
Secondly, the defendant argues that the state failed to prove that the substance Agent Alkire purchased was the same one which the agent gave to Officer Knox, which substance Knox left in the drop box, which an attendant took to the property room, which someone then took to the laboratory, and which the laboratory later tested and found to be methamphetamine.
The state argues that the undercover agent had sufficient contact with the defendant for him to be able to select the defendant from a lineup, and that identification by one witness is sufficient for a conviction. Regarding the chain of custody of the evidence, the state argued that the evidence which the state showed to the jury was sufficient for a finding that the evidence was an illegal drug.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in a *926 light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App. 2 Cir. 1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
|9In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App. 2 Cir. 2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 2005-0213 (La.1/19/06), 921 So.2d 94.

Identiñcation

The likelihood of misidentification violates due process when the totality of the circumstances indicate that misiden-tification probably occurred. State v. Brown, 40,769 (La.App. 2 Cir. 03/08/06), 923 So.2d 976, citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). When assessing the reliability of an identification, the following factors must be considered: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time between the crime and the confrontation. State v. Kemp, 39,358 (La.App. 2 Cir. 3/11/05), 896 So.2d 349, 356, writ denied, 05-0937 (La.12/09/05), 916 So.2d 1052, citing Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
Agent Alkire testified that he began his encounter with the defendant | lnin the grocery store parking lot, where he and the defendant talked with one another *927 face-to-face from their cars for several minutes. Alkire followed the defendant to the Highland neighborhood and subsequently identified him walking on Highland Road, where he let him in the vehicle and purchased the drugs from him.
Officer Knox also saw the defendant while watching the encounter between the defendant and Agent Alkire. Knox testified that he was not able to see the defendant very well, but that he nonetheless saw him well enough to describe the difference between the his appearance on the date of the crime and his appearance in court. In addition to testimony from these two officers, the jurors themselves saw the audiovisual recording of the meeting in the grocery store parking lot and the meeting that occurred inside Alkire’s car. Although the recorded images of the defendant’s face pass quickly, they are clear.
We conclude Agent Alkire’s testimony alone identifying the defendant as the perpetrator was sufficient evidence upon which the jury could convict the defendant, especially considering Alkire’s close face-to-face contact with the defendant in the Brookshire’s parking lot and during the drug transaction. This identification was further verified by Agent Knox and the video of the offender. The jury had more than enough evidence on which to find that the defendant was the perpetrator of the crime. Therefore, the conviction rests upon sufficient evidence of identity.

Chain of custody

The law on the chain of custody of evidence is well settled. To admit ^demonstrative evidence at trial, an object must be identified, either by testimony that the object is related to the case or by the chain of custody from the time of seizure until presentation at trial. For the admission of demonstrative evidence, it suffices if the foundation laid establishes by a preponderance of the evidence that it is more probable than not that the object is relevant to the case. It is not necessary that the evidence as to custody eliminate all possibilities that the object has been altered. A defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. State v. Booker, 46,256 (La.App. 2 Cir. 5/18/11), 70 So.3d 818, 823.
The defendant’s complaint that the state did not prove the chain of custody lacks merit. The state need not offer evidence of the chain of custody if, instead, it adduces testimony that the evidence is related to the case. At trial, Agent Alkire testified that the plastic bag containing the crystalline substance introduced in court was the drug which he bought from the defendant and gave to Officer Knox. Knox identified the writing on the plastic bag as his own. Bruce Stentz identified the substance as the one which he had tested at the crime lab. The state thus produced strong evidence that the substance shown at trial was the same as that which Agent Alkire bought in the transaction in question, and the defendant offers no grounds to doubt the state’s evidence other than the several steps in the chain of custody and the general possibility of mistake during storage and transfer. This argument is therefore without merit.
By his second assignment, the defendant contends that the trial court erred, as a matter of law, in allowing a portion of the video of the crime to be | ,2played to the jury where the undercover agent verbally identifies the perpetrator by name as the defendant. The defendant argues that Agent Alkire’s audio/visual recorded statement, “That was Corey Gay,” was inadmissible because it suggests that officers were investigating the defendant based upon evidence of prior crimes. He points out that he filed a motion in limine seeking notice *928 whether the state planned to introduce evidence of past crimes, and the state responded that it did not. The defendant also complains that the trial court allowed Alkire’s statement that federal-state law enforcement partnerships are not uncommon “especially if a narcotics offender or distributor has a long criminal history.”
The state argues that Agent Alkire’s recorded identification of the defendant was not evidence of prior crimes. Even if the comment implied past crimes, argues the state, it is far more probative than prejudicial because it speaks directly to the identity of the perpetrator, and mis-identification was a central argument of the defense.
According to La. C.E. art. 404(B)(1):
Except as provided in Article 412 [which concerns sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
A trial error does not provide grounds for reversal of a conviction and sentence unless it affects substantial rights of the accused. La. C. Cr. P. art. 921; State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. The test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), rehearing denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). The reviewing court must find the verdict actually rendered by this jury was surely unattributable to the error. Johnson, supra; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
Defendant objects to Agent Alkire’s statement, “That was Corey Gay,” because the statement tends to show that the investigation specifically targeted him, and thus, he contends, it implied that he had committed other crimes prior to the instant offense. We find no merit in this contention. Obviously a criminal investigation of an individual is based upon information obtained by police of illegal acts which they, in turn, investigate. Criminal investigations naturally infer that criminal activity has occurred or is ongoing thereby prompting the investigation. Likewise, identification of a perpetrator during an investigation indicates the identity of the perpetrator, but in no way constitutes evidence of “prior bad acts” contemplated by the Code of Evidence. As the trial judge ruled, the jurors were unlikely to infer from Officer Alkire’s statement that the defendant had committed other crimes.
Additionally, while prior bad acts are not admissible to prove 114character or acts in conformity therewith, they are admissible for many other purposes, including identity, provided that the state gives notice when the defendant requests to be informed of such usage. La. C.E. 404(B)(1). The defendant did request notice of any plans by the state to expose past crimes. Although the state told him *929 that it did not intend to introduce evidence of past crimes, the defendant nonetheless cannot have failed to know of the state’s intention to introduce the recording which contained this statement to which it objects. Therefore, assuming for the sake of argument that the statement in question constituted evidence of prior bad acts, the defendant had reasonable notice in advance of trial that the state would present this evidence of his identity.
The defendant also claims that it was error to allow admission of the statement by Alkire that federal and state law enforcement often worked together “especially if a narcotics offender or distributor has a long criminal history.” Defendant contends that this also was improper use of evidence of prior bad acts.
Our review of the transcript indicates that Agent Alkire, a Shreveport Police Officer who is currently assigned to the FBI Northwest Louisiana Violent Crime Force, made this statement at trial in response to a question on direct examination regarding under what circumstances and how often members of a federal task force might work with SPD or Caddo Sheriffs Office agents. Agent Alkire made the statement above as part of his general response that it really depended on the situation, but it was not uncommon for state and federal agents to work alongside one another.
|1sWe find no merit in the contention that this statement was introduced to show prior bad acts. Instead, the statement was made to explain how Shreveport Police, the Caddo Sheriffs Office and federal ATF agents may work together on the same criminal investigations. Furthermore, the defendant did not object to the statement by Alkire at trial, nor to a similar statement made by Knox during his testimony regarding federal and local agents working together.
This assignment is therefore without merit.
By his third assignment of error, the defendant alleges that the trial court erred, as a matter of law, in denying the defense’ motion to quash the habitual offender bill of information and finding defendant to be a seventh felony offender under the habitual offender law.
Defense counsel objected at the habitual offender hearing to inclusion , of the fifth conviction, guilty plea conviction in 2000 for attempted carjacking, on grounds that the prosecutor in that case, Laura Wingate, had been the defendant’s counsel in his 1995 conviction for simple arson, which presumably raised an issue regarding the validity of the conviction due to conflict of interest. Neither party could produce a transcript of the guilty plea. Defendant argued that prosecution by his former defense counselor was thus a procedural irregularity which needed a waiver from the defendant, and under State v. Shelton, 92-3070 (La.7/1/93), 621 So.2d 769, the absence of a transcript for the purpose of showing the exact nature of the guilty plea meant that the carjacking offense could not be used. The trial court rejected this argument and included this conviction as one of the defendant’s seven convictions on which the habitual offender adjudication 11fiwas based.
La. C. Cr. P. art. 680 states, in pertinent part, that a district attorney shall be re-cused from a case when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
[[Image here]]
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
*930 Rule 1.9 of the Louisiana Bar Association Rules of Professional Conduct (at La. R.S. Title 37, Ch. 4, art. XVI) reads:
(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
[[Image here]]
(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.
In State v. Crandell, 604 So.2d 123, 128 (La.App. 2 Cir.1992), this court stated:
In an action to recuse the district attorney, the defendant has the burden of showing, by a preponderance of the evidence, that the district attorney has a personal interest in conflict with the fair and impartial administration of justice. State v. Edwards, 420 So.2d 663 (La.1982). The mere fact that an assistant district attorney previously represented a defendant in the same criminal matter does not ipso facto require the district attorney and other members of his staff to be recused. State v. Brown, 274 So.2d 381 (La.1973); State v. Bell, 346 So.2d 1090 (La.1977). The law presumes that the attorney will respect a client’s confidences, and where counsel is not called upon to use against a former client any confidential knowledge gained through their former association, the accused suffers no prejudice. State v. Brazile, 231 La. 90, 90 So.2d 789 (1956); State v. Johnston, 546 So.2d 1231 (La.App. 1 Cir.1989); State v. Daughtery, 563 So.2d 1171 (La.App. 1 Cir.1990), writ denied, 569 So.2d 980 (La.1990).
The courts have consistently refused to recuse the district attorney and the rest of his staff when an assistant district attorney formerly represented the defendant. See State v. Brazile, supra; State v. Brown, supra; State v. Bell, supra; State v. Brown, 478 So.2d 600 (La.App. 2 Cir.1985); State v. Byrd, 491 So.2d 87 (La.App. 3 Cir.1986), writ denied, 506 So.2d 1219 (La.1987); State v. Johnston, supra; State v. Daughtery, supra. Also, see and compare State v. Edwards, supra; State v. West, 561 So.2d 808 (La.App. 2 Cir.1990), writ denied, 566 So.2d 983 (La.1990).
We note that none of the cases cited in Crandell involve a defendant’s past attorney later serving as prosecutor in a case against him. Rather, they all involve former defense counsel joining a district attorney staff, but a different assistant district attorney prosecuting the defendant.
In State v. Allen, 539 So.2d 1232 (La.1989), a lawyer represented a defendant in bankruptcy court, but later prosecuted the same defendant for arson with intent to defraud. Because of the bankruptcy, any insurance payments that the defendant received from the burned house likely would have gone to his bankruptcy trustee, so he would have gotten no profit from them. On appeal to the Louisiana Supreme Court, the defendant argued that the prosecutor had a conflict of interest because he *931 could have testified at the criminal trial that the defendant’s bankruptcy prevented him from benefitting from the alleged arson. The Supreme Court found that the bankruptcy proceeding had a substantial relationship to the criminal proceeding and, | ^therefore, reversed and remanded for a new trial with a different prosecutor.
In State v. Shelton, 621 So.2d 769, 779 (La.1993), the Louisiana Supreme Court held that if the defendant denies the allegations of the bill of information, the burden is on the state to prove the existence of the prior guilty pleas and that the defendant was represented by counsel when they were taken. If the state meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea.
The validity of the 2000 carjacking turns on whether the attorney, Ms. Wingate, had a personal interest in the cause which was in conflict with the fair and impartial administration of justice (as prohibited by La. C. Cr. P. art. 680), and second, whether she used information relating to the prior representation to the disadvantage of the former client (as prohibited by Rule of Professional Conduct 1.9). The defendant suggests no reason why the prosecutor had a personal interest in the carjacking case, nor does he suggest any private information from the previous simple arson case which she might have used to the defendant’s disadvantage in the later case.
Accordingly, the defendant has not shown a conflict of interest which would raise an issue regarding the 2000 carjacking conviction. He has shown no need for a perfect transcript of the conviction under Shelton. Therefore, we conclude that the trial court did not err when it included the fifth conviction in the habitual offender adjudication.

Boykin colloquy

Defendant also argues that the Boykin colloquy for the defendant’s 2006 conviction for possession of a Schedule I CDS was defective. The |19transcript for that guilty plea shows that the trial court informed him of his “right to confront witnesses at trial.” The defendant argues that the U.S. Constitution and this court’s ruling in State v. Russell, 46,426 (La.App. 2 Cir. 8/17/11), 73 So.3d 991, require Boy-kin colloquies to inform a defendant of a right to confront his accusers, rather than the more general “witnesses.”
The Constitution requires that a guilty plea be recorded showing that the defendant was informed of and waived his constitutional right against compulsory self-incrimination, the right to trial by jury, and the right to confront one’s accusers. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); State v. Markray, 45,129 (La.App. 2 Cir. 4/21/10), 35 So.3d 453. The trial court cannot rely on an assumption that defense counsel adequately informed the defendant of his rights. State v. Williams, 384 So.2d 779 (La.1980). In a felony case, a court shall not accept a plea of guilty without first addressing the defendant personally in open court and informing of, and determining that he understands, inter alia, the right to confront and cross-examine the witnesses against him. La. C. Cr. P. art. 556.1 A(3).
No specific articulation of the defendant’s rights is required or sacramental. State v. Smith, 375 So.2d 1328 (La. 1979). However, the core concept of the rights must be conveyed. For example, advising the defendant he has a “right to remain silent” is insufficient to describe [ 2pthe right against self-incrimination at trial, State v. Robicheaux, 412 So.2d 1313 (La.1982), and advising of a “right to trial” *932 is insufficient to describe the right to a jury trial, State v. Santiago, 416 So.2d 524 (La.1982).
In State v. Russell, supra, a defendant claimed on appeal that at his Boykin colloquy the judge asked him, “Do you understand by pleading guilty you waive your right to confront them at trial?” This court observed that the rule set forth by the Louisiana Supreme Court that advice of a right to confront “the state’s witnesses” or “the D.A.’s witnesses” is adequate. However, we found that the trial court’s advice that Russell could “confront them at trial,” without any antecedent word to show the identity of “them,” was inadequate.
In State v. Anderson, 34,491 (La.App. 2 Cir. 4/4/01), 784 So.2d 749, this court held that the phrase “you waive your right to confront your witnesses and to cross examine them at trial” adequately complied with the mandates of Boykin and La. C. Cr. P. art. 556.1. We reasoned that the admonition satisfied Boykin because “[i]n common usage, the phrases confront and cross-examine always connote adversarial activities.” The Louisiana Supreme Court cited this rationale with approval in State v. Mendenhall, 2006-1407 (La.12/8/06), 944 So.2d 560.
The question is whether advice that the defendant was waiving his right to “confront witnesses at that trial” violated Boykin v. Alabama, supra. In State v. Anderson, supra, where an almost identical statement to the one which occurred in this case, this court held that the statement satisfied Boykin because the word “confront” always connotes adversarial activity. We therefore conclude, under the same rationale, that the advice which the trial court gave in this case satisfies Boy-kin.
| ⅞1 Therefore, this assignment is without merit.
By his fourth and final assignment of error, the defendant alleges that the district court erred, as a matter of law, in sentencing defendant to an excessive sentence of life imprisonment.
The defendant argues that the sentence of life imprisonment is grossly out of proportion to the severity of the crime. He sold an amount of methamphetamine equal to only half a pack of sugar. The statutory sentencing range for the instant offense is only 2 to 30 years, and all of his prior convictions resulted in a total of only 16½ years. The trial court rejected this argument made in defendant’s motion to reconsider.
The state argues that the defendant has shown that he cannot stop himself from criminal activity. Any lesser sentence would deprecate the seriousness of this crime and the past offenses, and this case is not an exception to the general rule. It contends that the defendant is not worthy of a lesser sentence.
Appellate review of sentences for exces-siveness is a two-step process, the first being an analysis of the district court’s compliance with the sentencing guidelines of La. C. Cr. P. art. 894.1. State v. Mims, 619 So.2d 1059 (1993); State v. Williams, 45,755 (La.App. 2 Cir. 11/3/10), 54 So.3d 1129, writs denied, 2010-2682, 2010-2706 (La.4/25/11), 62 So.3d 85, 89.
A sentence violates La. Const, art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Lobato, 603 So.2d 739 (La.1992). A sentence is deemed grossly disproportionate if, when the crime and |a2punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribu *933 tion to acceptable penal goals. State v. Guzman, 99-1758 (La.5/16/00), 769 So.2d 1158. Normally, sentences at or near the maximum are reserved for the worst offenders and the worst offenses. State v. Cozzetto, 2007-2081 (La.2/15/08), 974 So.2d 665. Nevertheless, the sentencing court has wide discretion in imposing a sentence within statutory limits, and such a sentence will not be set aside as excessive in the absence of manifest abuse of that discretion. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7
Where there is a constitutional mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. In addition, to rebut the presumption that the mandatory sentence is constitutional, the defendant must clearly and convincingly show that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758; State v. Wilson, 37,555 (La.App. 2 Cir. 11/6/03), 859 So.2d 957, writ denied, 2003-3232 (La.6/4/04), 876 So.2d 73.
Where there is a constitutional mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. In addition, to rebut the presumption that the mandatory sentence is constitutional, the defendant must clearly and convincingly show that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758; State v. Wilson, 37,555 (La.App. 2 Cir. 11/6/03), 859 So.2d 957, writ denied, 2003-3232 (La.6/4/04), 876 So.2d 73.
The Louisiana Supreme Court has repeatedly held that mandatory life sentences for habitual offenders are generally not unconstitutional. Some habitual offenders are exceptions and deserve a downward departure. The defendant in this case contends that his life sentence is excessive and not tailored to him because the penalty for his current and prior offenses amounted to a total of 16½ years. We find no merit in this argument. This ^defendant has six previous felony convictions, one of which was a violent offense, and one of which was a drug offense. He also has another recent drug conviction not used toward his habitual offender status. While he has had several opportunities to stop his criminal activity, he has instead repeatedly returned to crime. Based on this record, he does not merit a downward departure. The statutorily-imposed life sentence is constitutional.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.