THOMAS, Judge.
J.P. (“the father”) and H.M. (“the mother”) are the unmarried parents of E.P. (“the child”) who was born prematurely on April 22, 2015. Hospital employees contacted the Calhoun County Department of Human Resources (“DHR”) to report that the mother had had no prenatal care, that the mother had uncontrolled diabetes, that the mother had tested positive for marijuana the day before the child was bom, that the child had been experiencing feeding difficulties, that the child was suffering from neonatal hypoglycemia, that the parents had displayed “lower mental functioning,” and that the mother had alleged and then denied “domestic-violence issues” to hospital employees. Amy Estell, a professional counselor employed by DHR, administered a parenting assessment and concluded that the parents “were not mentally capable of caring for this baby.”
One month later, while the child was still in the hospital, DHR filed a complaint in the Calhoun Juvenile Court in which it alleged that the child was a “dependent child” as defined by to § 12-15-102(8), Ala. Code 1975. DHR requested a pick-up order. The juvenile court appointed a guardian' ad litem for the child, an attorney for the mother, and an attorney for the father.
A shelter-care hearing was held, after which the juvenile court awarded pendente lite custody of the child to DHR. On June 29, 2015, the juvenile court ordered the father to submit to a paternity test. On June 30, 2015, the juvenile court appointed, in addition to their separate attorneys, a separate guardian ad litem for each parent. At that time, the father was 36 years old.
*1179 A dependency hearing was held on September 23, 2015. On September 24, 2015, the juvenile court entered a judgment, determining that the child was dependent, that reasonable efforts to reunite the family had failed, that placement with the parents was not in the child’s best interests, that reasonable efforts to reunite the family would continue, and that the father is the “legal and biological father” of the child. The juvenile court awarded custody of the child to DHR.
On October 7, 2015, the father filed a postjudgment motion, arguing that the evidence presented was insufficient to support the judgment. On October 15, 2015, the juvenile court entered a judgment in which it corrected certain omissions in its September 24, 2015, judgment but did not alter its determinations. On October 22, 2015, the father filed a timely notice of appeal seeking this court’s review of whether sufficient evidence supports the judgment.[1]
“The juvenile court heard ore tenus evidence regarding dependency; therefore, its judgment is accorded a strong presumption of correctness.” A.M.W. v. A.G.M., 189 So.3d 75, 77 (Ala.Civ.App.2015).
“““[T]he trial court has the advantage of observing the witnesses’ demeanor and has a superior opportunity to assess their credibility, [and, therefore, an appellate court] cannot alter the trial court’s judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong.’ ” Ex parte Farm, 810 So.2d 631, 636 (Ala.2001) (quoting Ex parte D.W.W., 717 So.2d 793, 795 (Ala.1998)). The trier of fact, and not this court, has the duty of resolving conflicts in the evidence. Ethridge v. Wright, 688 So.2d 818, 820 (Ala.Civ.App.1996).
“(“ ‘[The appellate court is not] allowed to reweigh the evidence in this case. This [issue] ... turns on the trial court’s perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence ....’”
“‘Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996)).’
“D.C.S. v. L.B., 84 So.3d 954, 961-62 (Ala.Civ.App.2011).”
F.W. v. T.M., 140 So.3d 950, 959 (Ala.Civ.App.2013).
At the time of the dependency hearing, the child had been in the custody of DHR since her release from the hospital following her premature birth. Neither parent testified or presented witnesses. Testimony presented by DHR demonstrated that, unlike healthy infants, the child had required weekly medical appointments for a suspected genetic disorder.[2] Estell testi *1180 fied that the father might not remember to transport the child to her weekly medical appointments.[3] Estell testified that the patents did not know how to care for themselves, much less a medically fragile infant; that there had been time to counsel the parents only five times since the child was born; and that the only parenting skills'that the parents had grasped were how to prepare a bottle and how to change a diaper. - As aptly noted by the child’s guardian ad litem:
“This is not a termination of parental rights; this is dependency; the state will have plenty of time to work with these parents to see if they have the ability to take care of [the child].”
When asked whether the father was able to care for the child, Estell testified that the father had displayed an inability to grasp the basic concepts of caring for an infant and that she would expect him to continue to struggle in light of the child’s complex medical needs. Estell said that the father, who had no other children, had had little time to prepare to parent the child because the mother had not known that she was pregnant during the majority of her pregnancy. Thus, through no fault of his own, the father, who had displayed appropriate effort, had been afforded neither the time to complete a series of parenting classes nor the opportunity to participate in the child’s medical appointments. Regardless, Estell testified that, until the father, successfully completed a series of parenting classes, and addressed his potential mental-health issues, she would remain, concerned- that the father was unable ‘to meet the needs of the child.
Estell testified that the father had submitted to mental-health treatment until he was approximately 21 years old and that he had once been committed to an inpatient mental-health facility for, according to the father, depression and anxiety; however, Estell testified that the. father was unsure of his diagnosis. The following colloquy occurred between the child’s guardian ad litem and Estell:
“Q. What are your concerns specifically about [the father]?-
“A, Just that he doésn’t follow through with his own mental health care at the mental- health- center; he’s missed a lot of appointments,
“Q. Now, hold on before you continue on. T think it was two appointments that he missed at mental health; correct?
“A, Two or three. And now he’s just .now starting his intake process this month.
“Q. And the only reason he was going to • mental health was because DHR asked him to?
“A. That’s correct.
“Q. That he has gone for more than 10 years, almost 20 years without any mental health treatment because he didn’t .need it?
“A. He thinks his problems are managed, like the problems he had before.
“Q. So the mental health treatment, that’s one oflyour concerns about [the father]?
“A, Uh-huh,
“Q. What aré your others?
*1181 “A. The others are the same that I said before, parenting, learning how to parent, learning about what is going on with his child, what her needs are. Because they are just learning about the genetic issue. It would have been employment, but now he’s employed apparently. My concerns about him would be no different than, the concerns about [the mother]. He still seems to have a very difficult time grasping information, retaining, he’s trying. He’s trying, I just think he still has a lot to learn. “Q. And specifically what is your cpn-cern [regarding what] would happen to this child if the child went home to him today?”
Estell answered that she was not concerned that the father would fail to feed or diaper the child. However, Estell said: “My main concern is making sure that they have retained how to care for the child.” Estell identified specific parenting responsibilities that the father had not yet retained and could not yet discharge. She said that the father did not yet know “basic things” like an infant’s developmental milestones, how to bathe an infant, how to safely install and buckle a child-restraint seat, when, to introduce certain foods, when it is safe to leave an infant alone in a room, or how to recognize when an infant needs something or is not feeling well.
The record also demonstrates that the father had displayed an inability to care for himself. The juvenile court had appointed a guardian ad litem for the father, the father had failed to keep all his counseling and medical appointments, the father did not manage his own finances, and a third party received the mother’s disability check. Estell said:
“I think they need to continue in counseling. I know that it was discussed in the [individualized-service-plan meeting] that they have recently beg[u]n working with FOCUS to work with them on specific parenting needs. I would think they would need to do that. I’m going to be addressing substance abuse with them now that FOCUS is in the home [—a]nd then for [the father] to meet all his doctor, appointments at mental health.”
Finally, we note that the-juvenile court adjudicated the child dependent as to the mother and the father and that the mother did not file a notice of appeal. Because the unmarried parents live together, it appears likely that, 'if the father had custody, the child would be left in the care of the mother when- the recently employed father is at work; thus, the child would potentially be in the care of a noncustodial parent who is unable or unwilling to parent the child. “Obviously, if a- parent is unable or unwilling to discharge his or her parental responsibilities to and for the child or the' parent’s conduct or condition is such that the parent cannot render proper care for the child, it would be in the child’s best interests to be removed from the custody of the parent.” J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1210 (Ala.Civ.App.2007). Estell said that DHR could not provide a person to be in the house for an extended period every day and that, even if DHR was present in the home for two hours “every single day,” she would still be “.very nervous” about leaving the child in the care of the parents.
The record contains ample clear and convincing evidence to support a finding that, however willing he might be, the father was simply unable to properly care for or supervise the child at the time of the adjudication of her dependency. See C.O. v. Jefferson Cty. Dep’t of Human Res., 206 So.3d 621 (Ala.Civ.App.2016)(concluding that sufficient evidence supported a finding of dependency when a mother struggled with an addiction to pain medication, had.been seen intoxicated, and was incar *1182 cerated at the time of trial); T.C. v. Y.R., 162 So.3d 920, 925 (Ala.Civ.App.2014)(con-cluding that sufficient evidence supported a finding of dependency when a parent displayed instability, frequent moves, violent romantic relationships, and refusal to submit to mental-health counseling); and Ex parte T.L.L., 597 So.2d 1363, 1364 (Ala.Civ.App.1992)(concluding that sufficient evidence supported a finding of dependency when the parents displayed a history of instability and inattentiveness to the needs of the child). Accordingly, we conclude that sufficient evidence supports the dependency judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
MOORE and DONALDSON, JJ., dissent, with writings.

.
“We have specifically noted that, in the context of juvenile dependency orders, an order determining that a child is (or that a child remains) dependent coupled with a disposition of that child’s custody is a final judgment capable of supporting an appeal. C.L. v. D.H., 916 So.2d 622, 626 (Ala.Civ.App.2005); see also Ex parte D.B.R., 757 So.2d 1193, 1195 (Ala.1998)(holding ‘that a decision of a juvenile court finding that children were dependent and awarding temporary custody to the children’s maternal grandparents and the state, constituted a "final judgment, order, or decree” ’ (citing Potter v. State, Dep't of Human Res., 511 So.2d 190, 192 (Ala.Civ.App.1986))).”
Marshall Cty. Dep’t of Human Res. v. J.V., 203 So.3d 1243, 1247 (Ala.Civ.App.2016).

. Presumably due to her age, the child’s doctors were, according to Estell, "trying to nar *1180 row down if in feet she does have a genetic issue.” " The testimony presented focused on attempts to discover the specific diagnosis,

. Estell testified that DHR had attempted to teach the father how to use a calendar and that DHR had posted signs to remind the father to brush his teeth twice per day—an extraordinary step that Estell had never before seen.