THOMAS, Judge.
In 2009, the Marshall County Department of Human Resources (“DHR”) removed J.J.V. (“the child”) from the custody of M.M.T. (“the mother”). At that time, the child’s father, J.V. (“the father”), was living in Florida, where the child and the mother had resided until the mother left the father.[1] The father came to Alabama to locate the mother and the child only to learn that DHR had removed the child from the mother’s home.
The father, without the aid of counsel, attempted to work with DHR, and he briefly reunited with the mother. However, when a DHR caseworker informed him that the child would not be returned to the parents if they resided together, the father left the mother’s residence. The father retained an attorney and secured supervised visitation with the child in the fall of 2010. In December 2010 and January 2011, the father was granted unsupervised visitation with the child; he had a total of five unsupervised visits with the child.
On January 8, 2011, a few hours after the child had returned from an unsupervised visit with the father, the child’s foster parents contacted the child’s DHR caseworker, who was, at that time, Tracy Burrage. B.B. (“the foster father”) told Burrage that the child had reported that the father had “hurt her butt.” At Bur-rage’s instruction, the foster parents took the child to the emergency room, which then referred the child to Crisis Services of North Alabama for an examination by a forensic nurse examiner.
*1245 After the accusation, the father’s visitation was changed to supervised visitation. The child cried and said that she did not want to attend visits with the father. When at the visits, the child barely interacted with the father.
In October 2011, the father was charged with sexual abuse. He was arrested and placed in the Marshall County jail, where he remained for approximately 18 months. DHR filed a petition to terminate the father’s parental rights; however, the juvenile court denied that petition. DHR appealed, and this court reversed the juvenile court’s judgment declining to terminate the father’s parental rights and remanded the cause for the juvenile court to reconsider DHR’s termination-of-parental-rights petition based on the evidence already adduced at trial, indicating in our opinion that the juvenile court had perhaps mistakenly believed that late perfection of service of process on the father had prevented the juvenile court from considering the termination-of-parental-rights petition at the time of the termination-of-parental-rights trial. See Marshall Cty. Dep’t of Human Res. v. J.V., 152 So.3d 370 (Ala.Civ.App.2014). On remand, the juvenile court entered a another judgment declining to terminate the father’s parental rights; no appeal was taken from that judgment.
Meanwhile, the sexual-abuse charge against the father was dismissed on February 11, 2013. The father was then transferred to a detention facility in Louisiana on an immigration hold based on his status as an illegal immigrant. The father was released from the Louisiana facility in September 2014, after a 17-month detention.[2] The father then moved to Canton, Georgia.
The father filed a petition in the juvenile court on November 6, 2014, seeking an award of custody of the child. After a three-day hearing in December 2014, the juvenile court entered an order on December 29, 2014, stating the following:
“1. This matter is set for further review on disposition on January 20, 2015, at 9:00 a.m.
“2. At that time, DHR shall:
“a. Present a plan to'transition physical custody of the child to her father by the time the child completes her spring semester of school. This plan shall include the name of a licensed psychologist near the father’s residence in Georgia who can counsel the child and the father. This plan shall also include a proposal of gradually increased visitation, which visitation schedule shall take into account the father’s work schedule.
“b. Present a home study of the father’s residence in Georgia.
“3. Between now and January 20, 2015, DHR shall ensure that the father is able to visit with his child as frequently as once per week for a period of no less than two hours. These visitations may be supervised by DHR.. The visitations shall be at times when the father is not working. The foster parents shall not attend the visitations or provide transportation to the visits.
“4. DHR shall pay the costs of any home study, and until further Orders, any and all counseling fees.
“5. On January 20, 2015, the father shall present photos of his house — both inside and out. At that time the father *1246 shall identify the school the child would attend, should the child live in the house. Also, the father should describe the provisions he will make for child care when he is at work and the child is not in school.”
The review hearing set for January 20, 2015, was rescheduled because of inclement weather, as was the rescheduled February review hearing. On March 23, 2015, the parties discussed on the record the failure to create a transition plan as required by the December 29, 2014, order. Subsequently, a transition plan was created by the parties; the juvenile court entered an order incorporating the agreed-upon transition plan on March 27, 2015. In addition to setting out the transition plan, the order contained, among other things, the following provisions:
“1. This matter is set for further re- , view on disposition on May 12, 2015 at . 9:00 a.m.
“[2]. At this time, the father’s visitation plan to transition physical custody of his child from the Marshall County Department of Human Resources shall be.as [set out in the following omitted subpar-agraphs]:
".....
“[3]. It is the intention of the parties and- Court upon the receipt of an approved Home Study from Georgia that ¡the father’s visits with his child shall transition to supervised visitation in his home. The Marshall County Department of Human Resources has agreed to provide a Spanish interpreter in addition to an in home service provider. The father’s visitation shall be as [set out in the following omitted subparagraphs]:
[[Image here]]
“[4]. On June 12, 2015, physical custody of the minor child shall be placed with her father pending further Order of the court.
“[5], The Marshall County Department of Human Resources has agreed to provide transportation to and from the visitation; however, the father has agreed to provide the names of in home relatives for approval by the Marshall County Department of Human Resources to assist in transportation during this transition. '
“[6]. The child and father shall continue to participate and cooperate with counseling with Dr. Eassa, a licensed psychologist.
“[7]. A hearing will be scheduled upon the motion of any party and notice being given.”[3]
After the review hearing was held on May 12, 2015, an amended order regarding the transition plan was entered on May 18, 2015. The May 2015 order, like the March 2015 order, set out the- specific transition plan and stated that the child would be permanently transitioned to the father’s physical and legal custody no later than July 27, 2015. The May 2015 order also contained the following provisions referencing a home study:
“3. It is the intention of the parties and Court upon the receipt of an approved Home Study from Georgia through the Interstate Compact [on the Placement of Children (TCPC’j, codified at Ala.Code 1975, § 44-2-20 et seq.,], that the father’s visits with his child shall transition to supervised visitation in his home.
[[Image here]]
“4, On July 27, 2015, physical custody of the minor child shall be placed with *1247 her father pending further Order of the Court upon the receipt of an approved Home Study from Georgia through the ... ICPC.”
On June 23, 2015, DHR moved for an evidentiary hearing. In its motion, which was amended June 30,, 2015, DHR alleged that the home study conducted pursuant to the Interstate Compact on the Placement of Children (“the ICPC”), codified at Ala. Code 1975, § 44-2-20 et seq., had not been approved and that the child was not prepared to transition to the home of the father on July 27, 2015. The juvenile court held a hearing on July 2, 2015, at which the parties presented testimony regarding the progress of the father and the child toward reunification and the basis for the disapproval' of the ICPC home study. After considering that evidence, the juvenile court entered a judgment on July 2, 2015, ordering that legal and physical custody of the child be transferred to the father and that the transition of physical custody occur no later than July 27, 2015. DHR timely filed its notice of appeal. After the juvenile court denied its motion for a stay of the July 2, 2015, judgment, DHR sought a stay in this court, which this court granted.
As a preliminary matter, we must consider the father’s argument that the December 29, 2014, order was the final judgment in this matter and that, therefore, DHR’s appeal, filed within 14 days of the entry of the July 2, 2015, judgment is untimely. Generally,
“‘“[a] final judgment is a'terminative decision by a court of competent jurisdiction which demonstrates there has been complete adjudication of all matters in controversy between the litigants within the cognizance of that court.”’ Dabbs v. Four Tees, Inc,, 984 So.2d 454, 456 (Ala.Civ.App.2007) (quoting Jewell v. Jackson & Whitsitt Cotton Co., 331 So.2d 623, 625 (Ala.1976)). ‘ “[T]he test of a judgment’s. finality is whether it sufficiently ascertains and declares the rights of the parties.”’ Coosa Valley Health Care v. Johnson, 961 So.2d 903, 905 (Ala.Civ.App.2007) (quoting Ex parte DCH Reg’l Med. Ctr., 571 So.2d 1162, 1164 (Ala.Civ.App.1990)).”
J.W.K. v. Marshall Cty. Dep’t of Human Res., 18 So.3d 956, 958 (Ala.Civ.App.2009). We have specifically noted .that, in the context of juvenile dependency orders, :an order determining that a child is (or that a child remains) dependent coupled with a disposition of that child’s custody is a.final judgment capable of supporting an appeal. C.L. v. D.H., 916 So.2d 622, 626 (Ala.Civ.App.2005); see also Ex parte D.B.R., 757 So.2d 1193, 1195 (Ala.1998)(holding “that a decision of a juvenile court finding 'that children were dependent and awarding temporary custody to the children’s maternal grandparents and the state, constituted a ‘final judgment, order, or decree’ ” (citing Potter v. State Dep’t of Human Res., 511 So.2d 190, 192 (Ala.Civ.App.1986))). However, a juvenile-court judgment that does not resolve the issue of permanent custody is not considered a final judgment for purposes of appeal. See B.W.C. v. State Dep’t of Human Res., 582 So.2d 579, 580 (Ala.Civ.App.1991) (explaining that a juvenile-court order awarding custody on a temporary basis until further evidence was submitted, i.e, until after a home study to be performed on the home of the child’s mother was conducted, was a pendente lite custody order and was not capable of supporting an appeal).
The juvenile court stated at the July 2, 2015, hearing that it intended its December 29, 2014, order to' be a final judgment concerning the award of custody to the father once the transition was accomplished. However, as DHR points out, the December 29, 2014, order did not award the father physical or legal custody of the child. Instead, it ordered that a plan be *1248 established for the transition of the child, and it did not alter the earlier award of legal and physical custody of the child to DHR. Although the intent of the December 29, 2014, order was that the child would ultimately be returned to the custody of the father, that order did not change the legal or physical custody of the child. The ultimate resolution of the father’s custody petition was not accomplished until the entry of the July 2, 2015, judgment, which awarded him both legal and physical custody of the child. Thus, the December 29, 2014, order, which itself clearly contemplated continued proceedings as the child was transitioned to the father’s custody through a series of' increased visitations, was not a final judgment.[4]
Turning now to DHR’s issue on appeal, DHR argues that the evidence presented to the juvenile court does not support the juvenile court’s decision to return custody of the child to the father or to order that the transition of custody occur no later than July 27, 2015.[5] The parties appear to agree that the juvenile court was required to evaluate the father’s custody petition under the standard applied to the disposition of a dependent child.[6] We note that the juvenile court’s decision regarding custody or placement is governed by the best-interest-of-the-child standard. K.F. v. Cleburne Cty. Dep’t of Human Res., 78 So.3d 983, 989 (Ala.Civ.App.2011). Moreover, Ala.Code 1975, § 12-15-314, outlines possible dispositions of dependent children; that statute states, in pertinent part:
“(a) If a child is found to be dependent, the juvenile court may make any of *1249 the following orders of disposition to protect the welfare of the child:
“(1) Permit the child to remain with the parent, legal guardian, or other legal custodian of the child, subject to conditions and limitations as the juvenile court may prescribe.
“(2) Place the child under protective supervision under the Department of Human Resources.
“(3) Transfer legal custody to any of the following:
“a. The Department of Human Resources.
[[Image here]]
“(4) Make any other order as the juvenile court in its discretion shall deem to be for the welfare and best interests of the child.”
Our standard of review of the custody decision of a juvenile court is well settled.
“In a child custody casé [in which the evidence is presented to the trial court ore tenus], an appellate court presumes the trial court’s findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error. Reuter v. Neese, 586 So.2d 232 (Ala.Civ.App.1991); J.S. v. D.S., 586 So.2d 944 (Ala.Civ.App.1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala.1992).”
Ex parte Alabama Dep’t of Human Res., 682 So.2d 459, 460 (Ala.1996). Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support' its judgment, provided that those' findings are supported by the evidence. D.M. v. Walker Cty. Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005).
The evidence at the December 2014 hearing tended to indicate that the child had been declared dependent at an earlier proceeding and that the child had been in the custody of DHR since March 2009. The juvenile court did not expressly state in any order or judgment that the child continued to be a dependent child, but the evidence supports the conclusion that the child continued to be dependent at the time of the disposition because she was, until the father’s request for the return of custody was determined, a child without a parent to provide for her care, support, or education, based, in part, on allegations that the father had subjected the child to abuse. See Ala.Code 1975, § 12-15-102(8)1. & 2.
The testimony at the December 2014 hearing established that the father, who is originally from Guatemala, had become employed upon his release from incarceration. The father was employed doing landscape work for $14 per hour. He said that he lived in Canton, Georgia, in a four-bedroom townhouse with his sister; M.V., her boyfriend, P.P., and his sister’s four children. The father’s sister did not work outside the home. According to the father, the sister’s boyfriend paid $500 of the $1,400 rental payment for the townhouse. The father testified that he could meet all of his expenses. He also said that his' sister, who does not speak English, would provide child care for the child while he worked.
The father admitted that he had not paid child support while the child was in foster care; however, the juvenile court noted that the father had been incarcerated for approximately three years. The father denied having ever inappropriately touched the child. He said that he had stayed incarcerated on the immigration hold because he wanted to stay in the *1250 United States and fight for custody of the child.
By the time of the July 2, 2015, hearing, the father had lost his landscaping job because, he said, he had missed too much time attending court hearings. The father had secured another position as a house framer; he said that he earned $18 per hour at his current job and that he was paid in cash. The father testified that his expenses were $2,881 per month and that he could meet his expenses, even when he had earned $15 per hour. He said that he routinely worked overtime. The father also testified at the July 2015 hearing that Mr. P., who the father said was his sister’s boyfriend’s brother, had moved out of the townhouse; the father also said that Mr. P. had been paying $250 in rent each month.[7]
The father testified at the July 2015 hearing that he had not had any unsupervised visits with the child since December 2014. However, he stated that his relationship with the child was improving. The father also said that he-would continue counseling because, he said, it had helped him and because, he said, his relationship with the child had improved as a result of the counseling.
As noted above, Burrage, the child’s DHR caseworker between April 2009 and 'February 2013, testified regarding the sexual-abuse allegations made against the father. Before the allegations were made, Burrage said, the child had not appeared afraid of the father. However, Burrage also testified that the child had not been bonded to the father even before the allegations were made. .
M.B. (“the foster mother”) also testified regarding the allegation that the father had sexually, abused the child. According to the foster mother, the child had indicated that her bottom hurt when she received her bath the evening of January 8, 2011. The foster mother said that she had removed the child from the bath and had discovered a swollen, red wound in the child’s genital area. She further testified that the child had reported that “daddy J.” had hurt her and that he had told her not to tell anyone. After the allegation of abuse, the foster mother testified, the child began to scream and cry before leaving for visits with- the father. The foster mother admitted that the child had made allegations in May 2010 that “daddy Paco” and “daddy Coda,” two men that remain unidentified, had each “hurt her butt.” The foster mother also reported that the child had suffered from nightmares in 2010 and that the child had awakened from sleep in 2010 with scratches on her face that the child said had been inflicted by “mommy M.,” referring to the mother, although the child had not been in the care of the mother.
Liana Hill, a forensic nurse examiner with Crisis Services of North Alabama, testified that she had examined the child on January 8, 2011, after the allegation of sexual abuse was made. Hill explained that a forensic nurse examiner is trained to examine victims of alleged sexual abuse. Hill testified that she had discovered what she described as an abrasion to the child’s *1251 posterior fourchette. She noted that the wound was not fresh and appeared to be healing when she examined the child. Hill indicated that the wound likely occurred a few days before January 8, 2011. Photographs of the wound taken by Hill are contained in the record.
Carol Copeland, a social worker who counseled the child in 2014, testified that the child had described the father as “bad and scary.” According to Copeland, the child was allowed to select puppets to represent people in her life and she chose a rattlesnake to represent the father. Copeland related that the child would place the rattlesnake puppet in a drawer to represent jail and that the child would say that she hoped the father would stay in jail. Copeland also testified that the child had disclosed that the father touched her between her legs. Copeland admitted that' the child had also disclosed that a “bad man” had touched her and that the mother had not protected the child from the “bad man”; Copeland agreed that the child was not referring to the father when she mentioned the “bad man.” Copeland described the child as highly fearful of the father and said that the child’s fear had manifested itself though the child’s inability to focus in school, fear of going to public places, and sleeplessness.
Two of the child’s visitation transporters/supervisors testified at the December 2014 hearing. Tina Smith supervised 8 to 10 visits in February and March 2011. She said that the child did not want to attend the visits with the father. She said the child would cry and repeat that she did not want to go. According to Smith, the child was indifférent when the father arrived for the visits, the child did not sit beside the father during the visits, and the child refused to allow the father to pick her up. Smith said that the child would not look at the father and that she never acted happy to see him. Smith testified that she quit supervising the child’s visits because she could not watch the child being so upset over the visits.
Jennifer Copeland testified that she had taken over the task of transporting the child and supervising visits after Smith quit; she said that she supervised the child’s visits for seven months between April 2011 and October 2011. She, too, testified that the child would cry and scream that she did not want to attend the visits. According to Jennifer, the child would say that she was afraid of the father and that she feared that he would hurt her. Jennifer said that sometimes the child would hold the door frame as they attempted to leave the foster parents’ home. She testified that the child was not happy to see the father and that she never showed the father any affection, Jennifer said that the child would not eat food that the father had touched. Although the child would answer questions posed by the father, Jennifer .explained that the child would not carry on a conversation with the father and that she did not smile at the father.
The child testified. She‘ explained that the father had hurt her when she was visiting with him alone at his home. According to the child, she was standing up in the living room at the father’s home watching television when he walked up and touched her bottom with his hand. The child said that the touch was hard and that it hurt. She also testified that the father had told her not to tell anyone. She said that she was afraid of the father and that she did not want to see him again. She also said that she wanted to live with the foster parents.
Dr. Elaine Eassa, a licensed psychologist practicing in Georgia, testified , at the July 2, 2015, hearing. She had been counseling the child and the father since March *1252 or April 2015 to assist them with reunification. Dr. Eassa said that the child had indicated, even at her first sessions, that she did not feel safe with the father, that she did not want to be alone with the father, and that she did not want to live with the father. Dr. Eassa opined that the child was not ready to transition into the father’s home. Dr. Eassa explained that, if the child were placed with the father before she was ready for the transition, the child would become oppositional and defiant, act out, be depressed, and exhibit troublesome behaviors and that the father would need to be prepared to address those behaviors. However, Dr. Eassa lacked confidence the father could handle the child’s expected behavior.
Dr. Eassa had observed the father and the child together only once, on June 27, 2015, the Saturday before the July 2, 2015, hearing. She said that the child would not communicate with the father. According to Dr. Eassa, the child had told the father at the visit before the June 27, 2015, visit that she did not want to live with him.
Dr. Eassa explained that she understood that the child would often yell at the father and throw things, including rocks,- at him during visitations. Dr. Eassa said that the child had said that she “had a bag packed,” indicating perhaps that she planned to run away. Furthermore, Dr. Eassa testified that the child had made statements indicating that she might harm herself if she was forced to stay with the father.
When asked if the child was “driving the show,” Dr. Eassa explained that, in her opinion, the child should be in control of the reunification plan. She said that an immediate transition to the father’s custody would retraumatize the child. When asked to clarify whether the initial trauma to the child was actual sexual abuse or being convinced by the foster parents that such abuse had occurred, Dr. Eassa stated that it did not matter because, to the child, the abuse had occurred.
Dr. Eassa testified that the father had been making progress toward reunification. She explained that some of the issues with the father’s ability to parent the child were culturally based; she explained that parents from the Guatemalan culture were more lenient about a child’s misbehavior. As an example, Dr. Eassa related that the father gave into the child’s demand for an ice cream even after she had thrown rocks at him. Dr. Eassa said that she had encouraged the father to be more assertive with the child and to set limits with her; she said that if the father did not learn to set those limits, the child, who Dr. Eassa indicated had a tendency to be “bossy,” would “run all over, him.” According to Dr. Eassa, the father was cooperative in counseling sessions and tried to incorporate her advice; she said that he had done very well in counseling and had become more assertive with the child with Dr. Eassa’s encouragement. However, Dr. Eassa opined that the. father was not yet ready to parent the child on his own. She also testified that she had discussed the progress of reunification with the father, stating:
“We talked about [whether he] is he ready for her to be reunified because I have concerns about his ability to handle her because I think that she is really going to have difficulty making that transition. And we talked about [the fact] that [reunification] may not [occur] as quick[ly] as [he] thought it [would] and he is aware of that and he is agreeable to whatever needs to be done. He is willing to do whatever we need to do for [the child].”
The ICPC home study that the State of Georgia performed was admitted into evidence. The home study indicated that the father’s home was safe for the child. The *1253 ICPC home study questioned the father’s financial ability to support himself and the child and raised questions regarding the father’s criminal history, which consisted of the dismissed indictment for sexual abuse of the child. Furthermore, the ICPC home study indicated that Dr. Eassa had opined that reunification was not appropriate at the time because of the child’s persistent fear of the father.
Stacy Duncan, the child’s DHR caseworker after February 2013, testified that, without an approved ICPC home study from Georgia, DHR was unable to place the child with the father in Georgia. Specifically, she explained that Alabama could not monitor a child placed in another state and that, without an approved ICPC home study, another state (like Georgia) would also fail to monitor the child. Duncan confirmed that the Georgia ICPC home study indicated concerns about the father’s financial ability to care for the child, his criminal history, and the lack of an established relationship between him and the child.
The juvenile court did not make specific factual findings in support of its December 29, 2014, March 27, 2015, or May 18, 2015, orders or its July 2, 2015, judgment. Thus, we must presume that the juvenile court made those finding necessary to support its judgment, provided the evidence presented would support such findings. See D.M., 919 So.2d at 1210. DHR argues generally that the evidence does not support the juvenile court’s judgment awarding custody of the child to the father. However, DHR further argues that placement of the child with the father immediately is premature, not in the child’s best interest, and not supported by the evidence presented to the juvenile court.
Insofar as DHR argues that the evidence does not support the juvenile court’s conclusion that the child should be returned to the father’s custody, we cannot agree. The evidence in the record regarding the father’s alleged abuse of the child was sharply conflicting, and the juvenile court, not this court, is the proper arbiter of the factual disputes presented by the conflicting evidence. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala.1992). The juvenile court resolved the factual disputes in favor of the father, and it has concluded that the child should be returned to the custody of her father. Our standard of review prevents us from reweighing the evidence and substituting our judgment for that of the juvenile court. Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004) (quoting Delbridge v. Civil Serv. Bd. of Tuscaloosa, 481 So.2d 911, 913 (Ala.Civ.App.1985)) (stating that an appellate court does not “ ‘reweigh the testimony and substitute its own judgment for that of the trier of fact’ ”). Thus, insofar as DHR argues for reversal of the juvenile court’s judgment awarding the father custody of the child, we must reject DHR’s argument and affirm the judgment of the juvenile court.
However, DHR also argues that the juvenile court’s order that the child be returned to the custody of the father no later than July 27, 2015, is not in the child’s best interest. To support the July 2, 2015, judgment ordering the transition of custody to occur no later than July 27, 2015, the juvenile court must have determined that reuniting the child with the father immediately would serve the child’s best interest. We agree with DHR that the record lacks evidence that would support the finding that the child’s best interest would be served by placing her in the custody of the father without further transitioning.
The record is replete with evidence indicting that the child believes that the father abused her, that she fears the father, and that she does not want to be alone with the father, much less be placed *1254 in his custody. According to Dr. Eassa, the child has indicated that she might run away or possibly harm herself if forced to spend time alone with the father. The evidence presented at both the December 2014 hearing and July 2015 hearing further indicates that the child treats the father with disrespect, including going so far as to throw rocks at him, or indifference and establishes that she feels no familial affection for him. Similarly, the evidence indicates that the father is not fully prepared to handle the behavior the child is expected to display if she is placed in his custody; Dr. Eassa testified that the father would often ignore the child’s misbehavior and give in to the child. Placing a child who is expected to display oppositional and defiant behaviors with a father who is ill-prepared to handle those behaviors would not serve the child’s best interest. At this time, the father and the child do not have a relationship strong enough to accomplish the transition of custody.
The record does not support a conclusion that the child’s best interest would be served by immediately awarding custody to the father. Both the child and the father would be ill-served by a transition of custody at this time and under these circumstances. Accordingly, we reverse the judgment of the juvenile court insofar as it ordered an immediate transfer of the child’s custody to the father, and we remand the cause for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
DONALDSON, J., concurs in part and dissents in part; with writing.

. The mother and the father were never married.

. According to the father, he had been granted legal-immigrant status, and he expected to receive his green card in early 2015.

. For the sake of clarity, because the juvenile court's order had four consecutive paragraphs delineated by the number “1,” we have renumbered the pertinent paragraphs of the order.

. The interim orders of the juvenile court entered on March 27, 2015, and May 18, 2015, similarly failed to award the father either physical or legal custody of the child. Those orders refined the plan for transitioning the child and, in fact, altered the date on which the transition was to be completed. Thus, those orders were also not final judgments capable of supporting an appeal.

. We note that DHR did not file a post-judgment motion, which is typically required before this court may review a question regarding-the sufficiency of the evidence, when a court has not made written findings of fact in its judgment. See New Props., L.L.C. v. Stewart, 905 So.2d 797, 801-02 (Ala.2004). However, our supreme court has explained that other means of raising the sufficiency issue to the trial court are acceptable. See Weeks v. Herlong, 951 So.2d 670, 677 (Ala.2006). As our supreme court noted in Weeks, "[t]he purpose of findings of fact is to allow tire parties and the appellate court to understand the basis of the trial court’s order.” Weeks, 951 So.2d at 678. In Weeks, the supreme court determined that the trial court’s reasoning for its determination that a prescriptive easement existed was adequately stated in the record when the trial court had discussed with counsel its decision on the easement issue. Id. at 677. The juvenile court in the present case discussed at length its decision to return custody of the child to the father at the close of the December 2014 hearing. Thus, we conclude that we may consider the sufficiency question despite the fact that DHR failed to file a postjudgment motion directed to the July 2, 2015, judgment.

.DHR does not argue on appeal, as it did at trial, that the father’s request to have the child returned to his custody was subject to the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984). The Ex parte McLendon standard applies to a biological parent in a dependency case who seeks a return of a child's custody after that child’s custody has been awarded, even temporarily, to a third party based on a finding of dependency. P.A. v. L.S., 78 So.3d 979, 981-82 (Ala.Civ.App.2011); In re F.W., 681 So.2d 208, 211 (Ala.Civ.App.1996). Because DHR does not argue on appeal that the juvenile court applied an incorrect standard to the father’s request for custody, we will evaluate the juvenile court’s judgment awarding custody of the child to the father under the best-interest standard applicable to the disposition of a dependent child as explained in the text, infra. See K.F. v. Cleburne Cty. Dep’t of Human Res., 78 So.3d 983, 989 (Ala.Civ.App.2011).

. The ICPC home study performed by the Georgia authorities indicates that no other adult male lives in the father's residence; it specifically notes that a "Mr. P." had moved out recently. No further questions regarding the father’s living arrangements were asked at the July 2015 hearing, so we are unable to determine whether Mr. P. was, in fact, the sister's boyfriend, who the father had testified paid $500 in rent, or whether he was another roommate who moved into the house after December 2014. However, it appears that the sister’s boyfriend no longer lives in the residence with the father and the sistér; whether he continues to pay a portion of the rent is unclear.