MURDOCK, Justice.
J.J.V. (“the child”) is the daughter of J.V. (“the father”). The Marshall County Department of Human Resources (“DHR”) has filed with this Court a petition for a writ of mandamus by which it seeks an order directing the Marshall Juvenile Court to set aside or vacate its order of April 3, 2016, addressing the transfer of legal custody and physical custody of the child to the father.[1]
The child was born in October 2006. The pertinent facts, as summarized in an earlier Court of Civil Appeals’ opinion involving the same parties, are as follows:
“In 2009, the Marshall County Department of Human Resources (‘DHR’) removed J.J.V. (‘the child’) from the custody of M.M.T. (‘the mother’). At that *347 time, the child’s father, J.V. (‘the father’), was living-in Florida, where the child and the mother "had resided until the mother left, the father.[2] The father came to Alabama to locate the mother and the child only to learn that DHR had removed the child from the mother’s home.
“The father, without the aid of counsel, attempted to work with DHR, and he briefly reunited with the mother. However, when a DHR: caseworker informed him that the child would not be returned to the parents if they resided together, the father left the mother’s residence. The father retained an attorney and secured supervised visitation with the child in the fall of 2010. In December 2010 and January 2011, the father was granted unsupervised visitation with the child; he had a total of five unsupervised visits with the child.
“On January 8,2011, a few hours after the child had returned from an unsupervised visit with the father, the child’s foster parents . contacted the child’s DHR caseworker, who was, at that time, Tracy Burrage. B.B. (‘the foster father’) told Burrage that the child had reported that the father had ‘hurt her butt.’ At Burrage’s instruction, the foster parents took the child to the emergency room, which then referred the child to Crisis Services of North Alabama for an examination by a forensic nurse examiner.
“After the accusation, the father’s visitation was changed to supervised visitation. The child cried and said that she did not want to attend visits with the father. When at the visits, the child barely interacted with the father.
“In October 2011, the father was charged with sexual abuse. He was arrested and placed in the Marshall County jail, where he remained for approximately 18 months. DHR filed a petition to terminate the father’s parental rights; however, the juvenile court denied that petition. DHR appealed, and this court reversed the juvenile court’s judgment declining to terminate the father’s parental -rights and remanded the cause for the juvenile court to reconsider DHR’s termination-of-parental-rights petition based on the evidence already adduced at trial, indicating in opr opinion that the juvenile court had perhaps mistakenly believed that late perfection of service of process on the father had prevented the juvenile court from considering the termination-of-parental-rights petition at the time of the termination-of-parental-rights trial. See Marshall Cty. Dep’t of Human Res. v. J.V., 152 So.3d 370 (Ala. Civ. App. 2014). On remand, the juvenile court entered another judgment declining to terminate the father’s parental rights; no appeal was taken from that judgment.”
Marshall Cty. Dep’t Human Res. v. J.V., 203 So.3d 1243, 1244-45 (Ala. Civ. App. 2016)(“J,V. I”).
In August 2013, the father agreed to submit to a polygraph examination in the criminal proceeding arising from the sexual-abuse charge. The results from that examination indicated that the father provided truthful answers to the questions posed to him. Based'on those results, the sexual-abuse charge against the father was dismissed with prejudice on February 11, 2014. Thereafter, the father, who was an illegal immigrant, was transferred to a Louisiana detention facility.
The father was released from the detention facility in September 2014 after his immigration status was changed to “an alien lawfully admitted for permanent residence.” 8 U.S..C. § ,1229b(b)(l). The father *348 then moved to Canton, Georgia, where his sister resided. The Court of Civil Appeals in J.V. I summarized the procedural history as follows:
“The father filed a petition in the juvenile court on November 6, 2014, seeking an award of custody of the child. After a three-day hearing in December 2014, the juvenile court entered an order on December 29, 2014, stating the following:
“‘1. This matter is set for further review on disposition on January 20, 2015, at 9:00 a.m.
“ ‘2. At that time, DHR shall:
‘“a. Present a plan to transition physical custody of the child to her father by the time the child completes her spring semester of school. This plan shall include the name of a licensed psychologist near the father’s residence in Georgia who can counsel the child and the father. This plan shall also include a proposal of gradually increased visitation, which visitation schedule shall take into account the father’s work schedule.
“‘b. Present a home study of the father’s residence in Georgia.
“‘3. Between now and January 20, 2015, DHR shall ensure that the father is able to visit with his child as frequently as once per week for a period of no less than two hours. These visitations may be supervised by DHR. The visitations shall be at times when the father is not working. The foster parents shall not attend the visitations or provide transportation to the visits.
“ ‘4. DHR shall pay the costs of any home study, and until further Orders, any and all counseling fees.
“ ‘5. On January 20, 2015, the father shall present photos of his house— both inside and out. At that time the father shall identify the school the child would attend, should the child live in the house. Also, the father should describe the provisions he will make for child care when he is at work and the child is not in school.’”
J.V. I, 203 So.3d at 1245-46.
The January 20, 2015, review hearing was rescheduled. On March 27, 2015, the juvenile court entered an order incorporating the transition plan that had been created by the parties and setting the matter for further review on May 12, 2015. The March 2015 order further stated:
“ ‘It is the intention of the parties and Court upon the receipt of an approved Home Study from Georgia that the father’s visits with his child shall transition to supervised visitation in his home. The Marshall County Department of Human Resources has agreed to provide a Spanish interpreter in addition to an in home service provider. The father’s visitation shall be as [set out in the following omitted subparagraphs]:
[[Image here]]
“ ‘... On June 12, 2015, physical custody of the minor child shall be placed with her father pending further Order of the court.
[[Image here]]
“ ‘... The child and father shall continue to participate and cooperate with counseling with Dr. Eassa, a licensed psychologist.’ ”
J.V. I, 203 So.3d at 1246. The Court of Civil Appeals continued:
“After the review hearing was held on May 12, 2015, an amended order regarding the transition plan was entered on May 18, 2015. The May 2015 order, like the March 2015 order, set out the specific transition plan and stated that the child would be permanently transitioned to the father’s physical and legal custody *349 no later than July 27, 2015. The May 2015 order also contained the following provisions referencing a home study.
“ ‘3. It is the intention of the parties and Court upon the receipt of an approved Home Study from Georgia through the Interstate Compact [on the Placement of Children (“ICPC”), codified at Ala. Code 1975, § 44-2-20 et seq.], that the father’s visits with his child shall transition to supervised visitation in his home.
[[Image here]]
“ ‘4. On July 27, 2015, physical custody of the minor child shall be placed with her father pending further Order of the Court upon the receipt of an approved Home Study, from Georgia through the ... ICPC.’
“On June 23, 2015, DHR moved for an evidentiary hearing. In its motion, which was amended June 30, 2015, DHR alleged that the home study conducted pursuant to the Interstate Compact on the Placement of Children (‘the ICPC’), codified at Ala. Code 1975, § 44-2-20 et seq., had not been approved and that the child was not prepared to transition to the home of the father on July 27, 2015. The juvenile court held a hearing on July 2, 2015, at which the parties presented testimony regarding the progress of the father and the child toward reunification and the basis for the disapproval of the ICPC home study.”
J.V. I, 203 So.3d at 1246-47. We note that the home study submitted by the Georgia Division of Family and Children Services reflects that the father resided with his sister and her four children in a six-bedroom townhome that was adequate for the child. The home, study notes that “[t]he room identified for [the child] is painted pink and has a full size bed with night stand and chest of drawers. There is bedding on the bed. The closet in the room is empty. It would be sufficient in size and space for an 8 year old child.” The home had not been approved, however, because of concerns about the above-referenced sexual-abuse charges against the father and because of concerns that the father was single and worked full time, that he had never parented independently, that continued therapy was needed to strengthen the child’s relationship with the father, and that the father’s financial stability could not be verified to the satisfaction of the person conducting the home study.
On July 2, 2015, the juvenile court entered a “Transition Review Hearing Order,” which states:
“1. The physical transition of the child to the child’s father shall occur absolutely no later than the previously agreed upon date of July 27, 2015. The occurrence of this final transition is no longer conditioned upon anything. .
“2. Between this date and July 27, 2015, the Department of Human Resources shall continue to provide the services set out in previously agreed to Orders.
“3. For a period of one year after July 27, 2015, the father and the child shall continue counseling with Dr. Elaine Eassa. The Department of Human Resources shall be responsible for the costs of said- counseling sessions for the first six months of said year. The father of the child shall be responsible for the costs of the counseling sessions for the second six months of the year. The Department of Human Resources, the Guardian ad Litem and the father’s attorney shall be provided copies of the progress reports from the counselor. The frequency of the counseling sessions shall not- be more frequent than the frequency to date, but at the discretion of the counselor, the frequency of the counseling sessions may be reduced during the counseling period.
*350 “4. In an effort to be perfectly clear, all physical custody, all legal custody and all authority over the child shall be returned to the father no later than July 27,2015.”
DHR appealed the July 2015 order to the Court of Civil Appeals.[3] See J.V. I. On appeal, DHR argued that the evidence did not support the juvenile court’s conclusion that the child should be returned to the father’s custody. The Court of Civil Ap-péáls rejected that argument, noting that “[t]he evidence in the record regarding the father’s ■ alleged abuse- of the child was sharply conflicting, and the juvenile court, not this court, is the proper arbiter of the factual disputes presented by the conflicting evidence.” 203 So.3d at 1253. The J.V. I court agreed with DHR, however, that
“the juvenile court’s order that the child be returned to the custody of the father no later than July 27, 2015, is not in' the child’s best interest.”
203 Só.3d at 1253. That court stated:
“To support the July 2, 2015, judgment ordering the transition of custody to occur no later than July 27, 2015, the juvenile court must have determined that reuniting the child- with the father immediately would serve the child’s best interest. We agree with DHR that the record lacks evidence that would support the finding that the child’s best interest would be served by placing her in the custody of the father without further transitioning. ■
“The record is replete with evidence indicating that the child believes that the father abused her, that she fears the father, and that she does not want to be alone with the father, much less be placed in his custody. According to Dr. Eassa, the child has indicated that she might run away or possibly harm herself if forced to spend time alone with the father. The evidence presented at both the December 2014 hearing and July 2Q15 hearing further indicates that the ■child treats the father with disrespect, including going so far as to throw rocks at him, or indifference and establishes *351 that she feels no familial affection for him. Similarly, the evidence indicates that the father is not fully prepared to handle the behavior the child is expected to display if she is placed in his custody; Dr. Eassa testified that the father would often ignore the child’s misbehavior and give in to the child. Placing a child who is expected to display oppositional and defiant behaviors with a father who is ill-prepared' to handle those behaviors would not serve the child’s best interest. At this time, the father and the child do not have a relationship strong enough to accomplish the transition of custody.
“The record does not support a conclusion that the child’s best interest would be served by immediately awarding custody to the father. Both the child and the father would be ill-served by a transition of custody at this time and under these circumstances. Accordingly, we reverse the judgment of the juvenile court insofar as it ordered an immediate transfer of the child’s custody to the father, and we remand the cause for proceedings consistent with this opinion.”
203 So.3d at 1253-54.
On remand, DHR and the father again agreed to a transition plan as to custody of the child. On April.3, 2016, the juvenile court entered an order incorporating that plan, which included increasingly longer periods of .visitation. The order provided that the father was to have supervised visitation at his home beginning on April 2, 2016, with a transition to periods of unsupervised visitation over the next few weeks. Beginning on April 29, 2016,- the father was to have unsupervised overnight visitation at his home, increasing to multiple days of unsupervised visitation over the next few weeks. The order then stated:
“2. On July 1, 2016 legal and physical custody of the minor child ... shall be transferred to her father .... '
“3. The child and father shall continue to participate and cooperate with counseling with Dr. Eassa, a licensed psychologist.
“4. The child and father shall participate in language classes to assist with communication.
“5. The Marshall County Department of Human Resources shall supervise the custody and placement of the minor child and father after July 1, 2016 for three (3) months.
“6. This matter is set for further review on disposition on October 3, 2016 at 9:00 a.m.”
On May 24, 2016, DHR filed a “Motion for Emergency Order to Cease Visitation Before May 27, 2016” in the juvenile court. The motion alleged that,
“[i]n early May, 2016, for the second time, [the child] attempted to harm herself by.cutting herself to avoid having to be with the father (the first incident was her attempt to electrocute herself). She has also threatened to run away from his home. Her behaviors indicate that her safety is at risk at the father’s home. Despite regular counseling sessions with Dr. Eassa, the child’s conduct or condition is not improving, but rather, is worsening. According to the foster parent, [the child] has exhibited disturbing behaviors, to wit: she cut herself intentionally because she said she would rather live in a hospital than with her father; she refused to bathe, brush her teeth, brush her hair, or have a bowel movement at her father’s home; she refused to eat food prepared at her father’s ■home; and she has become more withdrawn at school and at the foster home. The effect of forced visitation has been harmful to the child.” • ■
*352 The “Motion for Emergency Order to Cease Visitation Before May 27, 2016” further referenced a report prepared by Lois W. Petrella, a clinical psychologist who had evaluated the child on May 13, 2016. A copy of the report was attached to the motion. According to the report, the child
“has consistently been resistant to visits with her biological father, whom she refers to as ‘J—.’ She continues to assert that he sexually molested her, that she is afraid that he will hurt her again, and that she wants nothing to do with him. Regarding her biological father, [the child] stated, ‘I don’t usually talk to him.’ She explained that she does not like him because, ‘He hurt me a long time ago when I was little—he hurt me in my privates.’ She was adamant that she does not want to see her biological father again. She stated she does not like to talk about her father or the abuse, and kept herself distracted during this line of questioning, e.g., exploring the office, playing with puzzles, trying to change the topic, etc. She stated, ‘I don’t like going there,’ indicating that she feels as though ‘people’ make her go there against her will. She stated, ‘I want to live with [the foster parents].’ She said she feels ‘sad’ and ‘mad’ about being forced to visit and ultimately live with her biological father. She explained, ‘I don’t play with kids right when I get there, but after a little while I start playing with them.’ The children [the child] was referring to are her cousins .... She explained that she eventually starts to play with them because, ‘it’s either that or be bored.’ ”
The report notes that the child “reportedly has never been hospitalized for psychiatric purposes and has no history of taking routine psychiatric medications.” The report further notes that the child
“stated that she cries ‘sometimes, when I have to leave my mommy,’ referring to [the foster mother], and that she is always sad ‘whenever I have to leave my mommy and daddy.’ She has concentration problems and distracted herself in various ways when reporting her history, particularly when the subject was her biological father. Her affect was different when discussing her father, and at times she appeared to be dissociative. [The child] showed the examiner a cut on her finger and explained, ‘It happened when I was at [the father’s] house—I picked up a can and just cut myself.’ She said she did this intentionally because, ‘It would be better living in a hospital instead of having to live with him—that’s my opinion.’ She reported that on another occasion, T got tweezers and I stuck it in a cord and it made a shock, which was not smart to do.’ She explained, ‘That was when I was with [the foster parents] ‘cause I wanted to go to the hospital.’ She said she would intentionally harm herself if she is forced to go back to [the father’s] house. She has also threatened to run away if she is forced to go to live with him.”
Petrella concluded in her report that the child was “experiencing some paranoia about her father, as well as passive suicidal ideation.” The report concludes:
“The transition from foster care to her biological father’s custody would be detrimental to [the child’s] health and safety. This child firmly believes that [the father] sexually molested her when she was younger, and clearly she still seems to fear him. Additionally, since she apparently has not yet bonded with her biological father after all of his encouragement, it appears unlikely that she will do so in the future.
“Regressive behaviors, i.e., regression to a previous stage of development, *353 would be expected if [the child] is forced into a relationship with her biological father. Such behaviors might include reverting to baby talk, a decline in grades at school, lack of self care, and possibly more serious problems such as enuresis or encopresis. This becomes increasing important since [the child] soon will be entering another developmental stage, adolescence, which can be difficult for parents and children alike under the best of circumstances.
“Since [the child] has already made two small but significant attempts at self-harm and has thought of plans to run away from her biological father’s home, it certainly is possible that continuing extended visits and/or placing her in her biological father’s care would pose a threat of harm to herself or others. For the child’s health and safety, and continued emotional development, it would be in [the child’s] best interest if the visits were terminated.”
The “Motion for Emergency Order to Cease Visitation Before May 27, 2016” requested that the juvenile court enter an emergency order “ceasing visitation between the child and the father” and that the juvenile court “enter an Order continuing the minor child in the custody of [DHR].” The juvenile court denied the “Motion for Emergency Order to Cease Visitation Before May 27, 2016,” and it denied a motion DHR had filed seeking to stay the impending May 27 through May 30, 2016, visitation with the father.
On May 26, 2016, DHR filed an emergency motion to stay and a petition for the writ of mandamus in the Court of Civil Appeals. Ex parte Marshall Cty. Dep’t Human Res., 234 So. 3d 519 (Ala. Civ. App. 2016)(“J.V. II”). In denying that petition, the Court of Civil Appeals stated:
“The mandamus petition seeks an order from this court compelling the juvenile court to ‘terminate visitation between the child and the father,’ based on the premise that the juvenile court abused its discretion in not terminating visitation as requested. This court granted the stay pending resolution of this petition, which we now deny.
[[Image here]]
“DHR cannot show a clear legal right to the relief it seeks in its petition. The visitation of which DHR now complains is not true visitation. The visitation awarded in the April 3, 2016, order is transitional visitation aimed at preparing the child for the transition of custody to the father. DHR’s request that we order the juvenile court to ‘terminate’ the father’s visitation is in essence a request that we order the juvenile court to modify the award of custody to the father.
“However, this court has affirmed the award of custody of the child to the father. J.V., 203 So. 3d at 1253. DHR did not seek certiorari review of this court’s February 26, 2016, decision. The award of custody to the father has therefore become the law of the case. Ex parte S.T.S., 806 So.2d 336, 341 (Ala. 2001).
“‘The issues decided by an appellate court become the law of the case on remand to the trial court, and the trial court is not free to reconsider those issues. Murphree v. Murphree, 600 So.2d 301 (Ala. Civ. App. 1992). According to the doctrine of the law of the case, “whatever is once established between the same parties in the same case continues to be the law of that case, whether or not correct on general principles, so long as the facts on which the decision was predicated continue to be the facts of the case.” Blumberg v. Touche Ross & Co., 514 So.2d 922, 924 (Ala. 1987).’
*354 “Ex parte S.T.S., 806 So.2d at 341. The child’s custody is to be vested in the father at the completion of the transitional period, and the juvenile court is not free to alter the custody award merely upon motion of the parties.
“DHR’s allegations that the child has .harmed herself and has threatened to run away from the father’s residence, although nearly identical to testimony presented at the July 2016 evidentiary hearing before the entry of the July 2, 2015, judgment giving rise to the appeal in J.V. [I], are, in fact, allegations, presumably supported by new evidence, regarding the child’s best interests. The juvenile court may consider those allegations and any such new evidence in a modification action. However, DHR’s attempt to present new evidence to alter the award of custody in this action cannot.succeed.
“Accordingly, DHR’s petition for the writ of mandamus is denied. This court’s stay order is lifted.”
234 So. 3d at 520-21.
On May 27, 2016, while the mandamus petition in J.V. II was pending in the Court of Civil Appeals, DHR filed in the juvenile court a “Motion to Set Aside Custody Order.” DHR made similar' allegations to those set'forth in its “Motion for Emergency Order to Cease Visitation” and again referenced the report prepared, by Petrella. The “Motion to Set Aside Custody Order” alleged that there “ha[d] been a material change in circumstances and that it [was] in the child’s best interests that the prior order awarding legal and physical custody of the child to the father be set aside,” (Emphasis added.) DHR requested that the April 2016 order awarding the father custody be set aside and that the juvenile court order that the child remain in DHR’s custody.
On June 24, 2016, before the decision in J.V. II was issued, DHR filed a second petition for a writ of mandamus in the Court of Civil Appeals. The second petition was assigned case no. 2150795. The second petition noted that no further visitation had occurred between the father and the child after the Court of Civil Appeals granted DHR’s motion' to stay while J.V. II was pending. The second petition continued:
“But currently there is no order preventing or stopping the transfer of custody of the child to the father on July 1, 2016. On May 27, 2016, DHR' filed a Motion to Set Aside Custody Order in the juvenile court asserting that the new evidence that the child’s emotional and. physical health is at risk and a transfer of custody to the father is contrary to the child’s best interests. The trial court failed to conduct a hearing on said motion and failed to enter any order on the motion.”[4]
(Emphasis and reference to exhibit omitted.) DHR requested that the Court of Civil Appeals order the juvenile court to set aside its April 2016 order awarding custody to the father and that that Court consolidate the second petition with the petition then pending in J.V. II.
The Court of Civil Appeals did not enter a order consolidating DHR’s petitions. On July 1, 2016, the Court of Civil Appeals issued its decision in J.V, II. Also on July 1, 2016, the Court of Civil Appeals issued an order in case no. 2150795 denying DHR’s second petition for a writ of mandamus and denying a motion to stay DHR had filed with its second petition.
*355 DHR then petitioned this Court for a writ of mandamus, and DHR filed a -motion to stay the custody transfer scheduled for July 1, 2016. This Court granted the motion to stay pending our resolution of the petition for a writ- of mandamus. In its petition, DHR seeks an order from this Court directing that the April 2016 order “transferring legal and physical custody of [the child] to [the father] on July 1, 2016” be vacated or set aside.
As this Court has stated:
“Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.”
Ex parte Integon Corp., 672 So.2d.497, 499 (Ala. 1995).
The Court of Civil Appeals erred as to its conclusion in J.V. II that “the juvenile court is not free to alter the custody award merely upon motion of the parties,” 234 So. 3d at 521, and that DHR must file a new action in order to present evidence to the juvenile court as to facts that arose after the entry of the . April 2016 order. The underlying proceeding is a dependency case and, as discussed in note 3, supra, “[u]nlike many other types of cases, dependency proceedings often involve a series of appealable dispositional custody orders.” S.P. v. E.T., 957 So.2d 1127, 1131 (Ala. Civ. App. 2005). Although, .the April 2016 order at issue purported to award legal custody and physical custody of the child to the father as of July 1,2016, that order further provided:
“3. The child and father shall continue to participate and cooperate with counseling with Dr. Eassa, a licensed psychologist.
“4. The child and father shall participate in language classes to assist with communication.
“5. The Marshall County Department of Human Resources shall supervise the custody and placement of the minor child and father after July 1, 2016 for three (3) months.
“6. This matter is set for further review on disposition on October 3, 2016 at 9:00 a.m.”
In light of foregoing “restrictions”' as to the custody award to the father, it is clear that the juvenile court did not intend the April 2016 order “to be its ‘final’ disposi-tional order as to the pending case,” “free from any intervention or supervision by the state under the' dependency statutes” and regardless of what might transpire— or fail to transpire—during the transition of custody. 957 So.2d at 1131. See also Ala. Code 1975, § 12-15-102(8)a.8 (providing that a “dependent child” 'includes a child “[w]ho ... is in need of the care and protection of the state”);' Ala. Code 1975, § 12-15-314(a) (“If a child is found to be dependent, the juvenile court may make any of the following orders of disposition to protect the welfare of the child: (1) Permit the child to remain with the parent, legal guardian, or other legal custodian of the child, subject to conditions and limitations as the juvenile court may prescribe. . ;. (4) Make-any other order as the juvenile court in its discretion shall deem to be for the welfare and best interests of the child.”).- Thus, the juvenile court was free to take into account evidence regarding matters occurring after the entry of its April 2016 order and before any order it might issue on -October 3, 2016, in determining whether a modification of the terms of transition was warranted. For example, the juvenile court was free to take into account the failure of-transitional *356 efforts (which it had previously ordered) to achieve the results that were contemplated by it and that would be necessary for an eventual transfer of custody that would serve the child’s best interest.
. Presiding Judge Thompson commented in his dissenting opinion in J.V. II that the decision in J.V. I
“reversed that part of the judgment of the Marshall Juvenile Court (‘the juvenile court’) transferring immediate custody of J.J.V. (‘the child’) to J.V. (‘the father’) because of our concern for the welfare and safety of the child and to allow a more appropriate relationship between the father and the child to develop. [J.V. L] This court held that the father and the child did not ‘have a relationship strong enough to accomplish the transition of custody* and that ‘[bjoth the child and the father would be ill-served by a transition of custody at this time and under these circumstances.’ [J.V. I], 203 So.3d at 1254.
“Following this court’s decision in [J.V. I], the parties arrived at and the juvenile court sanctioned a ‘visitation plan to transition to legal and physical custody of the child to the father, which began with supervised visitation and gradually increased to unsupervised, overnight visitation. The ultimate goal of the transition was to have the father assume legal and physical custody of the child on July 1, 2016. The transition plan also provided that ‘[t]he child and [the] father shall continue to participate and cooperate with counseling with Dr. [Elaine] Eassa, a licensed psychologist.’
“In its petition for a writ of mandamus filed in this court, the Marshall County Department of Human .Resources (‘DHR’) alleges that certain events have occurred during the transition period, and it requests that this court order the juvenile court to ‘cease visitation in order to preserve the health and safety of the child.’ In support of its petition, DHR presented evidence indicating that Dr. Lois W. Petrella, a licensed psychologist, evaluated the nine-year-old child in mid-May 2016. Dr. Pe-trella diagnosed the child as having post-traumatic stress disorder, among other things. The child cut herself with a can while visiting her father and attempted to shock or electrocute herself in order to avoid being forced to visit the father. This child has also stated that—at nine years of age—she has had thoughts of suicide when faced with having to visit the father. The evidence presented in [J.V. I] indicated that, because the Georgia home study regarding the father’s home had not been approved, the Georgia child-protection agency would not monitor the family in connection with this case when the child visits the father or after the child is placed in the father’s custody in Georgia.
[[Image here]]
“Regardless of whether this court affirmed the initial award of custody to the father, the juvenile court possesses the power to halt visitation based upon the best interests and welfare of the child and to consider any properly filed modification action. Although I understand that the juvenile court is attempting to meet one of the goals of the Alabama Juvenile Justice Act (‘the AJJA’), § 12-15-101 et seq., Ala. Code 1975, by seeking to reunite the father and the child, I note that the AJJA requires that reunification be achieved in a manner that ensures the child’s safety. See § 12—15—101(b)(3), Ala. Code 1975 (A goal of the AJJA is ‘[t]o reunite a child with his or her parent or parents as quickly and as safely as possible when the child has been removed from the custody of his or her parent or parents unless reunification is judicially deter *357 mined not to be m the best interests of the child.’).
“The evidence from the most recent psychological evaluation of the child is consistent with previous evidence indicating that the child has engaged in self-destructive behavior, and it appears to me that the situation has deteriorated rather than improved since the issuance of our last opinion. I can see no reason to alter my position that an immediate transfer of custody to the father is not presently in the best interests of the child. It is the function of the courts of this state to protect the children before them. J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1211 (Ala. Civ. App. 2007); C.S. v. Mobile Cty. Dep’t of Human Res., 166 So.3d 680, 684 (Ala. Civ. App. 2014). The juvenile court appears to have rejected the allegations that the father sexually abused the child. In any regard, whether the child needs protection from the father or not, it is clear that the child needs protection from her own potential conduct if she is forced to visit the father or transition to his home.”
234 So. 3d at 521-23 (Thompson, P.J., dissenting).
The materials before us support the above-stated concerns of Presiding Judge Thompson and raise a substantial question as to whether the father can communicate with and control the child in a manner sufficient to ensure her safety upon the transfer of custody to him. We note, however, that no evidentiary hearing was conducted by the juvenile court as to the matters raised by DHR in its May 2016 filings. Given the allegations made by DHR and the contents of the report prepared by Petrella, the clinical psychologist, the juvenile court could not conclude that the concerns raised by DHR and Petrella could be ignored as a matter of law. Instead, the juvenile court should have scheduled a hearing so that it could properly evaluate any evidence DHR might present (including any testimony from Pe-trella) as to the alleged change in the child’s circumstances after the entry of the April 2016 order. Ex parte Fann, 810 So.2d 631, 638 (Ala. 2001) (“It is the court’s duty to scrupulously guard and protect the interests of children.”).
Based on the foregoing, the petition is granted; the juvenile court’s order of April 3, 2016, transferring legal and physical custody of the child to the father is vacated.
PETITION GRANTED; WRIT ISSUED.
Stuart, Bolin, Parker, Shaw, Main, Wise, and Bryan, JJ., concur.

. DHR's petition asks this Court to direct the Court of Civil Appeals to order the Marshall Juvenile Court to vacate the April 3, 2016, order. Because the Court of Civil Appeals denied DHR's petition for a writ of mandamus, we treat the petition to this Court as a petition seeking a writ directed to the trial judge. See Rule 21(e), Ala. R. App. P,

. The father and the mother were not married.

. In S.P. v. E.T., 957 So.2d 1127 (Ala. Civ. App. 2005), the Court of Civil Appeals noted:
"Unlike many other types of cases, dependency proceedings often involve a series of appealable dispositional custody orders. Eventually the trial court enters an order in a dependency proceeding that is intended to be its 'final’ dispositional order as to the pending case, i.e., a custodial placement that is intended to be permanent, to the extent custody awards can be permanent. See Ex parte J.P., 641 So.2d [276,] 278 [ (Ala. 1994) ] ('by its very nature, custody is always temporary and never permanent' because it is always subject to change based upon an appropriate petition and evidence). Under ideal circumstances, such final dis-positional orders coincide with the end of the child's dependency, i.e., the child has a proper custodian 'and' is no longer 'in need of care or supervision’ by persons other than the custodian. See Ala. Code 1975, § 12-15-l(10)n, In other words, under ideal circumstances, the final dispositional order results in a custody award wherein the parent or custodian is able and willing to have the care, custody, and control of the child, free from any intervention or supervision by the state under the dependency statutes.”
957 So.2d at 1131. Title 15 of Chapter 12, Ala. Code 1975, has been significantly amended and renumbered, See Ala, Code 1975, § 12— 15-102(8)a.8 (providing that a "dependent child” includes a child "[w]ho ... is in need of the care and protection of the state.”). See also Ala. Code 1975, § 12-15-314(a) ("If a child is found to be dependent, the juvenile court may make any of the following orders of disposition to protect the welfare of the child: (1) Permit the child to remain with the parent, legal guardian, or other legal custodian of the child, subject to conditions and limitations as the juvenile court may prescribe. ... (4) Make, any other, order as the juvenile court in its discretion shall deem to be for the welfare and best interests of the child.”).

. In its petition to this. Court, DHR states that "[t]he trial court failed to conduct a hearing on said motion and failed to enter any order on the motion.” We note that the motion did not include a request for a hearing.